UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

Erin Kang, Sang Ho Lee, and Jung Ja Kwon,

                    Plaintiffs,

— against —


Ryan Lee Romeo and Environmental Waste Minimization,

                    Defendants.

**18-cv-4033 (ARR) (SMG)**


**Opinion & Order**

---

ROSS, United States District Judge:

       This diversity action arose out of a motor vehicle accident that occurred on December 21, 2017 (the "2017 accident") in Queens, New York. Verified Compl. ("Compl.") ¶¶ 16, 18–19, ECF No. 1-1. Plaintiffs Erin Kang ("Kang"), Sang Ho Lee ("Lee"), and Jung Ja Kwon ("Kwon") (collectively, "plaintiffs") commenced this action against defendants Ryan Lee Romeo ("Romeo") and Environmental Waste Minimization ("EWM") (collectively, "defendants"), alleging that Romeo negligently operated a vehicle owned by EWM, causing him to strike Kang's vehicle and seriously injure Kang and her two passengers, Lee and Kwon. *Id.* ¶¶ 19–20, 23–25, 30–31, 34–36, 41–42, 45–47. Plaintiffs seek to recover damages for their alleged "serious injuries" pursuant to New York State's No-Fault Insurance Law ("No-Fault Law") §§ 5102(d) and 5104.

       The instant action was filed in the New York Supreme Court, Queens County on June 18, 2018. Defs.' Notice of Removal ¶ 1, ECF No. 1. Defendants removed the case to the United States District Court for the Eastern District of New York on July 13, 2018 pursuant to 28 U.S.C. § 1332. *Id.* ¶ 7. Before the court is defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiffs oppose. For the reasons set forth below, defendants' motion is granted in part and denied in part.

## FACTUAL BACKGROUND

### I.    Plaintiff Kang

Kang, a forty-eight-year-old woman living in the Bronx, New York, drove one of the vehicles involved in the 2017 accident. Plaintiffs' Answers to Defendants' Interrogatories, Defs.' Ex. NN ("Ans. to Interrogs.") ¶ 1, ECF No. 32-42; *see* Plaintiffs' Supplementary Answers to Defendants' Interrogatories, Defs.' Ex. OO ("Suppl. Ans. to Interrogs.") 9, ECF No. 32-43. Kang was involved in at least three motor vehicle accidents prior to the 2017 accident and one subsequent accident. Defs.' 56.1 ¶ 1; Pls.' 56.1 ¶ 1. She filed lawsuits alleging that she sustained serious injuries as a result of three of the accidents. Defs.' 56.1 ¶¶ 3, 13, 24; Pls.' 56.1 ¶¶ 3, 13, 24. She claims that the 2017 accident aggravated her preexisting injuries from prior car accidents and caused new injuries. Affidavit of Erin Kang, Pls.' Ex. C, ("Kang Aff.") ¶¶ 18–23, ECF No. 38-4.

### A.  Other Accidents and Injuries[1]

#### i.   2000 Accident

Kang was involved in a motor vehicle accident in 2000, in which she sustained head injuries and a concussion. Defs.' 56.1 ¶ 44; Pls.' 56.1 ¶ 44.

#### ii.  2014 Accident and Lawsuit

On January 17, 2014, Kang was again involved in a motor vehicle accident. Defs.' 56.1 ¶ 2; Pls.' 56.1 ¶ 2. She filed suit in New York Supreme Court, Queens County, pursuant to the No-Fault Law for injuries arising from that accident. Defs.' 56.1 ¶ 3; Pls.' 56.1 ¶ 3. Kang allegedly sustained various injuries to her lumbar spine and right knee. Defs.' 56.1 ¶¶ 8, 22, 29; Pls.' 56.1

---

[1] Medical experts for both plaintiffs and defendants note that Kang was involved in another car accident in 1989. *See infra* Discussion, Part I.B.i; *see also* Kang Aff. ¶ 20. Kang reportedly sustained head injuries in the accident. *Id.* The parties did not include this car accident in their 56.1 statements.

¶¶ 8, 22, 29; Verified Bill of Particulars, Index No. 701309/14, Defs.' Ex. E ("2014 Bill of Particulars") ¶¶ 7, 11, ECF No. 32-7.[2] A Magnetic Resonance Imaging (MRI) of Kang's right knee conducted on July 30, 2014 indicated that she sustained an "intrasubstance tear of the body of the medial meniscus, tear of the medial collateral ligament and grade 1 meniscal capsular separation of the medial meniscus." Defs.' 56.1 ¶ 4; Pl.'s 56.1 ¶ 4.

### iii.   2015–16 Accident and Lawsuit

On February 4, 2016, Kang filed suit in the Superior Court of New Jersey, Bergen County, alleging that in December 2015, a negligent driver struck the vehicle in which she was a passenger, seriously injuring her. Defs.' 56.1 ¶ 13; Pls.' 56.1 ¶ 13; Compl., Docket No. L-1185-16 ¶¶ 7, 11, 13, Defs.' Ex. K, ECF No. 32-13. Kang testified that the injuries she sustained in the 2014 accident were aggravated by the 2015 accident. Kang Dep. 69:2–70:7, Defs.' Ex. AA, ECF No. 32-29. She explained that she was treated for injuries to her right shoulder, neck, and back as a result of the 2015 accident. *Id.* at 64:22–65:2. Among other procedures, her treatment included physical therapy for her neck and shoulder three times per week for approximately six months and fifteen chiropractic treatments. *Id.* at 65:16–23; Various Medical Records from Dr. Scilaris, Dr. Xie, and Kang's Physical Therapy, Defs.' Ex. P ("Various Kang Med. Recs.") 7–29, ECF No. 32-18; Defs.' 56.1 ¶ 38; Pls.' 56.1 ¶ 38.

### iv.  2018 Accident and Lawsuit

Following the 2017 accident at issue in this case, Kang was involved in another car accident on August 13, 2018. She filed her complaint in New York Supreme Court, Bronx County on

---

[2] Erin Kang testified that she also sustained neck injuries from the 2014 accident, which were aggravated in the 2015 accident. Kang Dep. 69:14–70:7, Defs.' Ex. AA, ECF No. 32-29 ("A. Well, the 2014 accident my knee hurt, and my lower back, and my neck. . . . Q. Were they worsened or aggravated in 2015? A. Yes, it was aggravated.").

September 9, 2018. Defs.' 56.1 ¶ 24; Pls.' 56.1 ¶ 24; Verified Compl., Index No. 30399/2018E ("2018 Bronx Cty. Compl."), Defs.' Ex. Y, ECF No. 32-27. In her complaint, she again alleged that she "sustained serious injuries as defined by §5102(d) of the Insurance Law of the State of New York." 2018 Bronx Cty. Compl. ¶ 24.

### B.  2017 Accident

On December 21, 2017, defendant Romeo's vehicle collided with the vehicle driven by Kang. *See* Kang Aff. ¶ 2. Plaintiffs Lee and Kwon were passengers in Kang's car at the time. Statement of Additional Material Facts ("Pls.' 56.1 St. Add. Facts") ¶ 1, ECF No. 38-1[3]; Defs.' 56.1 Resp. ¶ 1, ECF No. 39-1. The parties dispute the extent of the damage to Kang's vehicle—defendants maintain that the driver-side rear wheel well was only scraped, whereas plaintiffs assert that it was also dented. Defs.' 56.1 ¶ 46; Pls.' 56.1 ¶ 46; *see* Photographs of Kang's Vehicle, Defs.' Ex. BB, ECF No. 32-30. No injuries were reported to or observed by the New York Police Department officers who responded to the scene of the accident. Defs.' 56.1 ¶ 40; Pls.' 56.1 ¶ 40. The parties dispute whether Kang hit her head on the steering wheel as a result of the accident. Defs.' 56.1 ¶¶ 42–43; Pls.' 56.1 ¶¶ 42–43.

#### i.  Alleged Injuries

Kang alleges that as a result of the 2017 accident, she sustained injuries to her head, left shoulder, right knee, lumbar spine, and cervical spine. Pls.' 56.1 St. Add. Facts ¶ 2. According to Kang, only the injuries to her left shoulder and head were originally caused by the 2017 accident. Kang Aff. ¶ 23. She alleges that the lumbar spine and right knee injuries she sustained from her 2014 accident were aggravated by the 2017 accident. Kang Aff. ¶¶ 18, 24. Likewise, she contends

---

[3] Plaintiffs append a Statement of Additional Material Facts to their Response to Defendants' 56.1 Statement, beginning on page 10 of the same document.

that she originally injured her cervical spine in the 2015 accident, but that the 2017 accident aggravated her injury. *Id.* ¶¶ 19, 24. She states that the 2017 accident was the direct cause of her head injuries, but also contends that it aggravated her previously diagnosed bipolar disorder. *Id.* ¶ 21.

Kang, drawing on her doctors' and radiologists' reports, set forth an extensive list of alleged injuries without identifying which she deemed to be serious and / or permanent:

### Head
- Global cortical atrophy predominantly involving the frontal and occipital lobes with bilateral clustered involvement of the parahippocampal entorhinal region;
- Global FA[4] reduction;
- Numerous foci of abnormal increased [T]2/FLAIR[5] signal within the white matter[6] [of] both cerebral hemispheres.

### Left Shoulder
- Cuff tendinosis and / or tendonitis;
- Impingement and supraspinatus outlet syndrome;
- Effusion;
- Synovitis;
- Hypoplastic partially torn labrum.

### Right Knee
- Partial [anterior cruciate ligament (ACL)] tear;
- Effusion;
- Meniscocapsular separation laterally;
- Bone island inflammation;

---

[4] Presumably referring to fractional anisotropy, a measurement used in Diffusion Tensor Imaging (DTI) studies. *Fractional Anisotropy*, ScienceDirect, https://www.sciencedirect.com/topics/neuroscience/fractional-anisotropy (last visited Aug. 11, 2020).

[5] T2-weighted Fluid Attenuated Inversion Recovery (T2-FLAIR or T2/FLAIR), a brain imaging technique.

[6] Dr. Golzad, medical expert for plaintiff, defines "white matter" as "the fiber connections enabling approximately 86 billion electrical brain cells or neurons to communicate." Report of Dr. Golzad, Pls.' Ex. E ("Kang Golzad Rep.") 11, ECF No. 38-6. He explains that "[w]hite matter injuries disrupt 'neuronal connectivity' and the brain's ability to communicate among its functional units." *Id.*

- Distal femur;
- Myxoid degeneration posterior horn medial meniscus;
- Superficial varicose veins;
- Some lateral patellar tilt and subluxation;
- No other internal derangement.

### Cervical Spine
- Patulous internal jugular veins;
- Heterogenous thyroid gland;
- C5-C6[7] bilobed 7mm disc herniation with ventral and bilaterally lateral recesses spinal stenosis;
- Thickened wavy nuchal ligament.

### Lumbar Spine
- Straightening of the lumbar lordosis;
- Transitional vertebrae at lumbosacral junction;
- No other focal internal derangement.

Pls.' 56.1 St. Add. Facts ¶ 3; Ans. to Interrogs. ¶ 4; Various Kang MRI Reports 2–4, Pls.' Ex. D, ECF No. 38-5 (head)[8]; Report of Dr. Golzad ("Kang Golzad Rep.") 7, Pls.' Ex. E, ECF No. 38-6 (head); Various Kang MRI Reports 6 (left shoulder); *id.* at 5 (right knee); *id.* at 7–8 (cervical spine); *id.* at 9–10 (lumbar spine); Report of Dr. Seldes, Pls.' Ex. A ("Kang Seldes Rep.") 10, ECF No. 38-2 (left shoulder, right knee, lumbar spine, and cervical spine).

The parties agree that Kang was confined to her home for one week after the accident and one week after each of her right knee and left shoulder arthroscopic surgeries. Defs.' 56.1 ¶ 53; Pls.' 56.1 ¶ 53. They disagree, however, as to the lasting impact of her injuries. Kang alleges that because of the 2017 accident, she can no longer jog and has difficulty performing various tasks,

---

[7] Referring to the fifth and sixth cervical vertebrae. *See Irvine v. U.S. Dep't of Veterans Affs.*, No. 3:14–cv–00197–HZ, 2015 WL 5919878, at *1 (D. Or. Oct. 8, 2015). A similar abbreviation is used to identify particular vertebrae of the lumbar, thoracic, and cervical spine throughout this opinion.

[8] Although all of the MRI reports in this case are unsworn, they are relied upon by various sworn medical opinions. Accordingly, I consider them competent evidence here. *See Pommes v. Perez*, 830 N.E.2d 278, 285 n.5 (N.Y. 2005).

such as lifting her son, sleeping on her left side, holding items with her left arm, completing household chores, standing, walking, or sitting for extended periods of time, kneeling, using a computer, reading a book, using stairs, and lifting heavy items. Pls.' 56.1 St. Add. Facts ¶¶ 46–47; Kang Aff. ¶¶ 28–29. She also reports "frequent headache, insomnia, loss of memories and sensitivity to light." Kang Aff. ¶ 29. Defendants argue, however, that these restrictions are due to Kang's preexisting and degenerative conditions, not the 2017 accident. Defs.' 56.1 Resp. ¶¶ 46–47.

Kang was not employed at the time of the 2017 accident, and thus, was not prevented from working as a result of her alleged injuries. Defs.' 56.1 ¶ 54; Pls.' 56.1 ¶ 54. She has collected Social Security Disability Income (SSDI) since age 25, when she was designated disabled due to bipolar disorder, a condition for which she was frequently hospitalized prior to the 2017 accident. Defs.' 56.1 ¶¶ 45, 55; Pls.' 56.1 ¶¶ 45, 55.

### ii. Treatment

Although the accident occurred on December 21, 2017, Kang reports that she first sought treatment for most of her alleged injuries on January 10, 2018. Pls.' 56.1 ¶ 41; Kang Aff. ¶ 4. The record indicates that she did not seek treatment for her alleged head injuries until September 26, 2018, over nine months after the accident. Kang Aff. ¶ 6; Kang Golzad Rep. 6. The parties agree that Kang underwent the following treatments or procedures, but dispute whether they were necessitated by the 2017 accident or preexisting and degenerative conditions:

*Head*
- MRI conducted October 2, 2018. Pls.' 56.1 St. Add. Facts ¶ 10.[9]

---

[9] Defendants' objections to plaintiffs' paragraphs nine through fourteen appear to be mis-numbered. Thus, I admit plaintiffs' assertions regarding the occurrence and date of the various MRIs. Defs.' 56.1 Resp. ¶¶ 9–14.

***Left Shoulder***
- Arthroscopic surgery dated April 9, 2018. *Id.* ¶¶ 4–5; Defs.' 56.1 Resp. ¶¶ 4–5; *see also* Report of Dr. Gidumal ("Kang Gidumal Rep.") 3–4, ECF No. 33-2.
- MRI conducted February 5, 2018. Pls.' 56.1 St. Add. Facts ¶ 11.

***Right Knee***
- Arthroscopic surgery dated July 9, 2018. Kang Gidumal Rep. 4; Kang Seldes Rep. 10.
- MRI conducted May 22, 2018. *Id.* ¶ 12.

***Cervical Spine***
- Cervical percutaneous discectomy, nuclear ablation, and annular modulation procedure on the C5–C6 dated July 14, 2018. Pls.' 56.1 St. Add. Facts ¶ 6; Defs.' 56.1 Resp. ¶ 6.[10]
- Trigger point injection "on the back area" dated February 7, 2018. Pls.' 56.1 St. Add. Facts ¶ 7; Defs.' 56.1 Resp. ¶ 7.
- C7-T1 epidural injection and cervical epiduralgram on the cervical spine dated May 17, 2018. Pls.' 56.1 St. Add. Facts ¶ 7; Defs.' 56.1 Resp. ¶ 7.
- MRI conducted January 26, 2018. Pls.' 56.1 St. Add. Facts ¶ 13.

***Lumbar Spine***
- MRI conducted January 26, 2018. *Id.* ¶ 14.

***General Treatment***
- Physical therapy, acupuncture, and chiropractic treatment from January 10, 2018 to May 10, 2019. Pls.' 56.1 St. Add. Facts ¶ 8; Defs.' 56.1 Resp. ¶ 8.

## II.     Plaintiff Lee

Lee is a sixty-eight-year-old man who was a passenger in Kang's car during the 2017 accident. Affidavit of Sang Ho Lee ("Lee Aff.") ¶ 2, Pls.' Ex J, ECF No. 38-11; *see* MRI Report of Dr. Solomon ("Lee 2018 MRI Rep.") 2, Pls.' Ex. K, ECF No. 38-12.

### A.    Alleged Injuries

Lee alleges that he sustained injuries to his left knee, cervical spine, and lumbar spine as a result of the 2017 accident, none of which predated the accident. Pls.' 56.1 St. Add. Facts ¶ 80;

---

[10] Although defendants deny plaintiffs' statements of fact without qualification in paragraphs six through nine, their objection implies that they do not dispute that the procedure occurred, but rather, that the procedure was required as a result of the 2017 accident.

Lee Aff. ¶¶ 11–13, ECF No. 38-11. Specifically, he attributes the following injuries to the accident:

### Left Knee
- Meniscal tear;
- Partial ACL tear;
- Joint effusion;
- Patella alta;
- Meniscocapsular separation laterally.

### Cervical Spine
- Multilevel facet arthrosis and ligamentum flavum hypertrophy with lateral recess and neural foraminal narrowing;
- Thickened wavy nuchal ligament;
- Prominent adenoids and palatine tonsils;
- Straightening;
- Multilevel loss of discal height and signal;
- C3-C4–C6-C7 central and diffuse 8mm disc herniations with central spinal stenosis.

### Lumbar Spine
- Transitional vertebrae at lumbosacral junction;
- Suggested sacral meningocele;
- Grade I and II spondylolisthesis at L5-S1;
- L5-S1 loss of discal height and signal with endplate changes;
- L5-S1 diffuse disc herniation with central, bilateral lateral recesses and neural foraminal stenosis when combined with facet arthrosis and ligamentum flavum hypertrophy.

Pls.' 56.1 St. Add. Facts ¶ 81; Ans. to Interrogs. ¶ 4; Lee 2018 MRI Rep. 2 (left knee), 3–4 (lumbar spine), 5–6 (cervical spine); Report of Dr. Scilaris ("Lee Scilaris Rep.") 9–10, Pls.' Ex. I, ECF No. 38-10. Defendants maintain that Lee sustained no acute injuries from the accident, but rather that he suffers from degenerative conditions in his knee, cervical, and lumbar spine. Defs.' Br. 30–31.[11]

Lee states that his injuries prevent him from working in a sushi store. Lee Aff. ¶ 17.

---

[11] Once again, defendants' objections appear to be mis-numbered, making it difficult to evaluate defendants' objections on the merits. *See, e.g.*, Defs.' 56.1 Resp. ¶¶ 80–82.

Nevertheless, both parties agree that Lee has not been totally restricted from working as a restaurant owner and operator due to the accident. Defs.' 56.1 ¶ 51; Pls.' 56.1 ¶ 51. Lee was confined to his residence for five days following the 2017 accident, plus an additional one week after his March 16, 2018 arthroscopy. Defs.' 56.1 ¶ 50; Pls.' 56.1 ¶ 50. Additionally, Lee avers that he has difficulty performing certain tasks, such as climbing stairs, squatting, and sitting, standing, or walking for an extended period of time. Lee Aff. ¶ 17.

### B. Treatment

Following the 2017 accident, records indicate that Lee did not seek medical treatment for approximately three weeks. His first recorded medical visit relating to the accident was on January 15, 2018. Report of Dr. Gidumal ("Lee Gidumal Rep.") 4, ECF No. 33-4.[12] Thereafter, Lee's treatment included:

*Left Knee*
- MRI conducted on January 26, 2018. Lee 2018 MRI Rep. 2.
- Left knee arthroscopy conducted on March 16, 2018. Lee Aff. ¶ 5.[13]

*Cervical Spine*
- MRI conducted on February 16, 2018. Lee 2018 MRI Rep. 5–6.
- Trigger point injection of the left levator scapula, capitis, and upper trapezius muscles dated February 21, 2018. Lee Various Medical Records 16, Defs.' Ex. MM, ECF No. 32-41.

---

[12] Lee maintains that he was first treated at Baarn Rehab and Pain Clinic on January 10, 2018 and was treated three times per week there from January 10, 2018 to March 15, 2018, and from December 18, 2018 to March 11, 2019. *See* Lee Aff. ¶ 4. He presents no evidence to that effect.

[13] Lee did not submit medical records from Dr. Wert indicating that this procedure occurred. Although Dr. Scilaris references this procedure in his report, his knowledge is based on Lee's statements. Lee Scilaris Rep. 10 (explaining that "[Lee] states he underwent the left knee arthroscopy performed by Dr. Wert on March 16, 2018, which did provide significant relief of his symptoms."). Although defendants object to this fact, *see* Pls.' 56.1 St. Add. Facts ¶ 82; Defs.' 56.1 Resp. ¶ 82, they themselves referenced Lee's arthroscopic surgery in their statement of facts, Defs.' 56.1 ¶ 50 (stating that "[p]laintiff Lee was confined to his residence for 5 days after December 21, 2017 and 1 week after arthroscopy of March 16, 2018."); Pls.' 56.1 ¶ 50. Thus, I consider this fact admitted for the purposes of this motion.

***Lumbar Spine***
- MRI conducted on February 16, 2018. Lee 2018 MRI Rep. 3–4.
- Trigger point injection on January 24, 2018. Pls.' 56.1 St. Add. Facts ¶ 84; Defs.' 56.1 Resp. ¶ 84;[14] Lee Various Medical Records 10.

***General Treatment***
- Electromyography (EMG) and nerve conduction velocity (NCV) test of the lower extremity conducted on February 28, 2018.[15] Lee Gidumal Rep. 2–3.

## III.   Plaintiff Kwon

Kwon is a sixty-five-year-old woman who was a passenger in Kang's car during the 2017 accident. Defs.' 56.1 ¶ 48; Pls.' 56.1 ¶ 48.

### A.   Alleged Injuries

Kwon alleges that as a result of the 2017 accident, she sustained injuries to her right shoulder, right ankle, cervical spine, lumbar spine, and thoracic spine. Pls.' 56.1 St. Add. Facts ¶ 48. Defendants maintain that Kwon's injuries are degenerative and thus, not caused by the 2017 accident. Defs.' 56.1 Resp. ¶ 48. Specifically, Kwon asserts that she sustained the following injuries:

***Right Shoulder***
- Bicep tendonitis and partial tearing;
- Biceps tenosynovitis;

---

[14] Defendants' response to plaintiff appears to be mis-numbered; from context, I have inferred that defendants do not deny that the January 2018 trigger point injection took place, despite this error.

[15] The NCV test measures the speed at which an electrical impulse moves through a patient's nerve and is often used to identify nerve damage. The EMG test, which is administered at the same time, helps to identify damage to the nerves and muscles. *Nerve Conduction Studies*, Johns Hopkins Med., https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/nerve-conduction-studies (last visited Aug. 11, 2020). Both are considered "objective tests" for the purposes of the No-Fault Law. *Mastrantuono v. United States*, 163 F. Supp. 2d 244, 255 (S.D.N.Y. 2001) (citing *Rookwood v. Valdez*, No. 99 Civ. 10285, 2001 WL 776939, at *4 (S.D.N.Y. July 11, 2001) and *Gillick v. Knightes*, 719 N.Y.S.2d 335, 336 (App. Div. 2001)); *see Rivera v. United States*, No. 10 Civ. 5767(MHD), 2012 WL 3132667, at *20 (S.D.N.Y. July 31, 2012).

- Impingement;
- Cuff tendinosis, tendinitis, and intrasubstance tearing;
- Synovitis;
- Joint fluid;
- Ganglion and/or synovial cysts;
- Partial labral tear.

*Right Ankle*
- Nonspecific signal abnormality of distal tibia;
- Achilles tendinosis and/or tendonitis;
- Joint effusion;
- Joint space narrowing.

*Cervical Spine*
- Thickened wavy nuchal ligament;
- Reversal of lordosis;
- Prominent adenoids and palatine tonsils;
- C3-C4 loss disc height and signal with 5 mm central and left paracentral disc herniation with central and left lateral recess spinal stenosis.

*Lumbar Spine*
- Dural ectasia;
- Transitional vertebrae at lumbosacral junction;
- Lower thoracic disc disease;
- Multilevel discal T2-weighted signal loss;
- L1-L2–L3–L4 and L5-S1 moderate diffuse disc bulging with thecal sac compression and bilateral neural foraminal narrowing when combined with facet arthrosis and ligamentum flavum hypertrophy.

*Thoracic Spine*
- T1-T2–T3-T4 and T5-T6–T8-T9 disc bulging;
- Biconcave vertebrae;
- Heterogeneous marrow signal;
- Cervical localizer revealing straightening.

Pls.' 56.1 St. Add. Facts ¶ 49; Ans. to Interrogs. ¶ 4; Kwon Various MRI Reports, Pls.' Ex. H ("Kwon MRI Rep.") 2–3 (lumbar spine), 4–5 (thoracic spine), 6 (right ankle), 7 (right shoulder), 8 (cervical spine), ECF No. 38-9; Report of Dr. Scilaris ("Kwon Scilaris Rep.") 8–10, Pls.' Ex. F, ECF No. 38-7.

Kwon was confined to her residence for five days following the accident and an additional

12

three days after her subsequent arthroscopy. Defs.' 56.1 ¶ 48; Pls.' 56.1 ¶ 48. Both parties agree

that Kwon's injuries did not totally prevent her from working as a restaurant owner and operator.

Defs.' 56.1 ¶ 49; Pls.' 56.1 ¶ 49. Kwon alleges, however, that she can no longer play tennis and

has difficulty with a variety of everyday tasks, including lifting heavy items, standing, sitting, or

walking for an extended period of time, and doing household chores. Affidavit of Jung Ja Kwon,

Pls.' Ex. G ("Kwon Aff.") ¶ 19, ECF No. 38-8.

### B.  Treatment

Allegedly as a result of the accident, Kwon's treatment included the following procedures:

***Right Shoulder***
- MRI conducted on January 26, 2018. Kwon Scilaris Rep. 8.
- Right shoulder arthroscopic surgery conducted March 16, 2018. *Id.* at 9–10.

***Right Ankle***
- MRI conducted on January 26, 2018. *Id.* at 9.
- Lidocaine and Kenalog injection administered on February 5, 2018. Kwon Aff. ¶ 6; Kwon Scilaris Rep. 9.

***Cervical Spine***
- MRI conducted February 16, 2018. Kwon Scilaris Rep. 9.

***Lumbar Spine***
- MRI conducted February 16, 2018. *Id.*

***Thoracic Spine***
- MRI conducted March 2, 2018. *Id.*[16]

## LEGAL STANDARD

### I.    Summary Judgment

To prevail on a motion for summary judgment the movant must show "that there is no

genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law."

---

[16] Like Lee, Kwon maintains that she was treated three times per week at Baarn Rehab and Pain Clinic from January 10, 2018 to March 15, 2018, and later from December 18, 2018 to March 11, 2019. Kwon Aff. ¶ 4. She also has adduced no evidence of these visits.

Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008). If the movant fails to meet its initial burden, the motion will fail even if the opponent does not submit any evidentiary matter to establish a genuine factual issue for trial. *BBS Norwalk One, Inc. v. Raccolta, Inc*., 117 F.3d 674, 677–78 (2d Cir. 1997).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co*., 536 F.3d 140, 145 (2d Cir. 2008). In doing so, the opposing party must come forward with sufficient evidence that would justify a reasonable jury in returning a verdict in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586–87 (1986). If "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," summary judgment must be denied. *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9–10 (2d Cir. 1983).

In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1).

## II.     No-Fault Law

Plaintiffs' claims are governed by New York's No-Fault Law, "which precludes recovery for non-economic loss arising out of negligence in the use or operation of an automobile except where the claimant has a serious injury." *Jones v. United States*, 408 F. Supp. 2d 107, 115 (E.D.N.Y. 2006) (citing N.Y. Ins. Law § 5102(a) (McKinney 2000)). Under the No-Fault Law, "serious injury" is defined as follows:

> a personal injury which results in death; dismemberment; significant disfigurement; a fracture; loss of a fetus; permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment.

N.Y. Ins. Law § 5102(d) (McKinney 2017). To recover for non-economic losses under the No-Fault Law, plaintiffs must show both that they sustained a serious injury and that the injury was "proximately caused by the accident at issue." *Evans v. United States*, 978 F. Supp. 2d 148, 164 (E.D.N.Y. 2013) (quoting *Carter v. Full Serv., Inc.*, 815 N.Y.S.2d 41, 43 (N.Y. App. Div. 2006)); *see* N.Y. Ins. Law § 5104(a) ("Notwithstanding any other law, in any action by or on behalf of a covered person against another covered person for personal injuries arising out of negligence in the use or operation of a motor vehicle in this state, there shall be no right of recovery for non-economic loss, except in the case of a serious injury[.]").

### A.  Causation

"[W]hen additional contributory factors interrupt the chain of causation between the accident and claimed injury—such as a gap in treatment, an intervening medical problem or a preexisting condition—summary dismissal of the complaint may be appropriate." *Pommells v. Perez*, 830 N.E.2d 278, 281 (N.Y. 2005). "With respect to pre-existing injuries, . . . defendant[s]

15

moving for summary judgment [are] required to submit 'persuasive evidence' as to the existence

of the plaintiff[s'] pre-existing injuries." *Evans*, 978 F. Supp. 2d at 164 (citing *Arenes v.*

*Mercedes Benz Credit Corp.*, No. 03 CV 5810 (NG) (MDG), 2006 WL 1517756, at *8

(E.D.N.Y. June 1, 2006), and *Pommells*, 830 N.E.2d at 287). If defendants meet their burden,

then the burden shifts to plaintiffs to "come forward with evidence addressing the defendant[s']

claimed lack of causation[.]" *Id.* (quoting *Arenes*, 2006 WL 1517756, at *8 and *Pommells*, 830

N.E.2d at 287). Defendants are entitled to summary judgment if plaintiffs fail to demonstrate a

genuine dispute of fact with regard to causation. *Id.* (citing *Arenes*, 2006 WL 1517756, at *8, and

*Pommells*, 830 N.E.2d at 287).[17]

      Conclusory assertions that the relevant accident caused plaintiffs' injuries are inadequate

to meet plaintiffs' burden. *Arenes*, 2006 WL 1517756, at *7 ("Where . . . the plaintiff's evidence

is limited to conclusory assertions by a treating physician that are tailored to meet statutory

requirements, summary judgment should be granted for the defendant."); *Watson-Tobah v. Royal*

*Moving & Storage Inc*., No. 13-cv-7483 (KBF), 2014 WL 6865713, at *13 (S.D.N.Y. Dec. 5,

2014) ("The law is clear that a conclusory expert opinion as to causation is insufficient to defeat

a motion for summary judgment."); *Rhone v. United States*, No. 04 Civ. 5037 (PKL), 2007 WL

3340836, at *9 (S.D.N.Y. Nov. 9, 2007) (expert medical opinions that do not address defendant's

evidence that injuries were degenerative or explain the basis for finding causation are

inadequate); *Carter*, 815 N.Y.S.2d at 43 ("[I]n the absence of an explanation of the basis for

---

[17] The Second Circuit has indicated that district courts should apply New York's burden-shifting
framework, despite its apparent tension with the *Celotex* summary judgment standard. *Perpall v.*
*Pavetek Corp.*, 12-CV-0336 (PKC), 2017 WL 1155764, at *12 n.27 (E.D.N.Y. Mar. 27, 2017)
(citing *Yong Qin Luo v. Mikel*, 625 F.3d 772, 777 (2d Cir. 2010) (per curiam)); *see also Rogers v.*
*McLamb*, No. 4-CV-7043, 2006 WL 2734228, at *3 n.2 (S.D.N.Y. Sept. 22, 2006) (adopting
New York's burden-shifting scheme, while acknowledging its tension with *Celotex*).

concluding that the injury was caused by the subject accident, and not by other possible causes evidenced in the record, an expert's 'conclusion that plaintiff's condition is causally related to the subject accident is mere speculation' insufficient to support a finding that such a causal link exists." (quoting *Montgomery v. Pena*, 798 N.Y.S.2d 17, 18 (N.Y. App. Div. 2005))); *see also Gay v. Cevallos*, No. 10 Civ. 949 (LMM), 2011 WL 2015528, at *5 (S.D.N.Y. May 17, 2011) (same) (citing *Valentin v. Pomilla*, 873 N.Y.S.2d 537, 539–40 (N.Y. App. Div. 2009)); *cf. Farook v. Bailey*, No. 05 Civ. 3785 LTS DF, 2007 WL 2076764, at *3 (S.D.N.Y. July 16, 2007) (expert medical opinion was not speculative where it "specifically discusse[d] the pre-accident evidence proffered by Defendants in reaching the conclusion that the [relevant] accident caused Plaintiff's injury, rather than an earlier accident"). Additionally, a plaintiff's self-serving and conclusory statements regarding causation are insufficient to raise a triable issue of fact if not corroborated by objective medical evidence. *Watson-Tobah*, 2014 WL 6865713, at *11 (citing *Carter*, 815 N.Y.S.2d at 43); *Rhone*, 2007 WL 3340836, at *9 (same).

## B. Serious Injury

As with the issue of causation, "[o]n a motion for summary judgment on the issue of serious injury, 'a defendant has the initial burden of establishing a prima facie case that the plaintiff's injuries are not serious.'" *Black v. United States*, No. 1:17-cv-01054, 2020 WL 1435092, at *4 (W.D.N.Y. Mar. 24, 2020) (quoting *Sanchez v. Travelers Cos.*, 658 F. Supp. 2d 499, 507 (W.D.N.Y. 2009)). "A defendant may satisfy this burden by providing a physician's report that concludes, based upon objective evidence, that the plaintiff either has no injuries or has recovered from them." *Id.* (quoting *Brusso v. Imbeault*, 699 F. Supp. 2d 567, 576 (W.D.N.Y. 2010)). A defendant may rely on unsworn reports from plaintiff's physicians or sworn affidavits or affirmations by the defendant's retained physicians. *Evans*, 978 F. Supp. 2d at 163 (citing

17

*Thomas v. O'Brien*, No. 08-CV-3250 (RLM), 2010 WL 785999, at *7 (E.D.N.Y. Feb. 26, 2010)).

"The burden then shifts to the plaintiff to come forward with objective evidence that she suffered a serious injury within the meaning of the no-fault law." *Black*, 2020 WL 1435092, at *4 (citing *Brusso*, 699 F. Supp. 2d at 576). Plaintiff's subjective complaints of pain, without more, are insufficient to satisfy this burden. *Bass v. Hout*, 13 Civ. 8516 (ER), 2019 WL 6527944, at *4 (S.D.N.Y. Dec. 4, 2019). "Such objective proof can include 'an expert's designation of a numeric percentage of a plaintiff's loss of range of motion' or 'an expert's qualitative assessment of a plaintiff's condition,' so long as the qualitative assessment is objective and 'compares the plaintiff's limitations to the normal function, purpose, and use of the affected body organ, member, function or system.'" *Id.* (quoting *Toure v. Avis Rent A Car Sys. Inc.*, 774 N.E.2d 1197, 1200 (N.Y. 2002)). "'As long as the plaintiff adduces sufficient objective evidence from which a jury could find that she sustained a serious injury, summary judgment must be denied 'notwithstanding some contrary probative evidence.'" *Evans*, 978 F. Supp. 2d at 163 (quoting *Rivera v. United States*, No. 10 Civ. 5767(MHD), 2012 WL 3132667, at *10 (S.D.N.Y. July 31, 2012)).

To meet plaintiff's burden of demonstrating serious injury, unsworn medical reports are not admissible evidence. *Id.* at 163 (citing *Robinson v. United States*, No. 02 Civ. 5166DF, 2005 WL 747039, at *6 (S.D.N.Y. Mar. 31, 2005)). Nevertheless, "attached reports to physician affidavits including unsworn MRI reports interpreted by the physician's affidavit are considered admissible evidence." *Id.* at 164 (citing *Alvarez v. East Penn Mfg. Co.*, No. 10 Civ. 09541(RKE), 2012 WL 4094828, at *5 (S.D.N.Y. Sept. 17, 2012) ("[T]o the extent the experts incorporated into their affirmations several unsworn reports of other doctors who examined plaintiff, these

18

unsworn reports were not the only evidence submitted by plaintiff in opposition to the motion, and may be considered to deny a motion for summary judgment." (quoting *Rivera v. Super Star Leasing, Inc.*, 868 N.Y.S.2d 665, 666 (N.Y. App. Div. 2008)) (internal brackets omitted))).

In the instant case, plaintiffs did not allege injuries causing "death; dismemberment; significant disfigurement; a fracture; [or the] loss of a fetus[.]" This motion, therefore, addresses the following four categories of serious injury:

> permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment.[18]

N.Y. Ins. Law § 5102(d) (McKinney 2017); *see* Defs.' Br. 40; Pls.' Br. 5, ECF No. 38-13.

### i.      Permanent loss of use of a body organ, member, function or system

"In order to establish a 'permanent loss of use of a body organ, member, function, or system' under § 5102(d), a plaintiff must show that the loss is a total loss." *Evans*, 978 F. Supp. 2d at 165 (citing *Oberly v. Bangs Ambulance Inc.*, 751 N.E.2d 457, 460 (2001) ("We hold that to qualify as a serious injury within the meaning of the statute, 'permanent loss of use' must be total.")); *Lopez v. United States*, 312 F.Supp.3d 390, 400 (S.D.N.Y. 2018) (same).[19]

### ii.     Permanent consequential limitation of use of a body organ or member

To demonstrate a "permanent consequential limitation of use of a body organ or member," a plaintiff must "demonstrate more than 'a mild, minor or slight limitation of use.'"

---

[18] Commonly referred to as the "90/180 standard." *Bass*, 2019 WL 6527944, at *4.

[19] Because plaintiffs' evidence does not show a permanent loss of use for any body part, I do not address this category further in this opinion.

*Evans*, 978 F. Supp. 2d at 165 (quoting *Katiraeifar v. Santrizos*, 1999 WL 425907, at *1 (2d Cir. 1999)). "Indeed, 'consequential limitation' instead means an important and qualitative limitation of use of a body part based on normal function, purpose and use of that body part." *Id.* (citing *Toure*, 774 N.E.2d at 1201, and *Dwyer v. Tracey*, 480 N.Y.S.2d 781, 783 (N.Y. App. Div. 1984)). "A tear in tendons, as well as a tear in a ligament, or a bulging disc is not evidence of a serious injury in the absence of objective evidence of the extent of the alleged physical limitations resulting from the injury and its duration." *Young Sung Lee v. Garvey*, 718 F. App'x 11, 15 (2d Cir. 2017) (quoting *Little v. Locoh*, 897 N.Y.S.2d 183, 184 (N.Y. App. Div. 2010), *cert. denied*, 139 S. Ct. 209 (2018)); *see also Mulligan v. City of N.Y.*, 993 N.Y.S.2d 24, 26 (N.Y. App. Div. 2014). "Further, '[p]ermanence' in this context 'is a medical determination that requires an objective basis, and mere repetition of the word "permanent" in a medical report is insufficient.'" *Evans*, 978 F. Supp. 2d at 165 (quoting *Alvarez*, 2012 WL 4094828, at *5).

### iii.      Significant limitation of use of a body function or system

Similarly, "whether a limitation of use or function is significant . . . (i.e., important) relates to medical significance and involves a comparative determination of the degree or qualitative nature of an injury based on the normal function, purpose and use of the body part." *Bass*, 2019 WL 6527944, at *4 (quoting *Toure*, 774 N.E.2d at 1201) (internal quotations and alterations removed). "A 'significant' injury is one that results in 'more than a minor limitation of use.'" *Id.* (quoting *Young Sung Lee*, 718 F. App'x at 15). The significant limitation must also be supported by "credible medical evidence of an objectively measured and quantified medical injury or condition." *Evans*, 978 F. Supp. 2d at 166 (quoting *Oved v. Salotti*, No. 98Civ.5628 (BSJ), 2000 WL 1099926, at *1 (S.D.N.Y. Aug. 7, 2000)).

"While proof of permanence is not required, plaintiff must show a limitation that is

significant in terms of duration as well as degree." *Hodder v. United States*, 328 F. Supp. 2d 335, 354–55 (E.D.N.Y. 2004) (citing *Partlow v. Meehan*, 548 N.Y.S.2d 239, 240 (N.Y. App. Div. 1989) (holding that, "[a]though Insurance Law § 5102(d) does not expressly set forth any temporal requirement for a 'significant limitation,' . . . if a bodily limitation is substantial in degree yet only fleeting in duration, it should not qualify as a 'serious injury' under the statute") and *Gualtieri v. Farina*, 283 F. Supp. 2d 917, 925 (S.D.N.Y.2003) (same)).

### iv.    90/180 standard

Lastly, to meet the 90/180 standard, "a plaintiff must show that he was prevented 'from performing his usual activities to a great extent, rather than some slight curtailment' for ninety of the 180 days following the accident." *Evans*, 978 F. Supp. 2d at 166 (quoting *Licari v. Elliott*, 441 N.E.2d 1088, 1091 (N.Y. 1982)). "[T]he ninety days requirement must be taken literally." *Arenes*, 2006 WL 1517756, at *9 (citing *Licari*, 441 N.E.2d at 1091).

"As with the other categories of injury, [a plaintiff's] allegations that her injuries fall within this category must be substantiated by objective medical proof; self-serving statements are insufficient to raise a triable issue of fact." *Brusso*, 699 F. Supp. 2d at 583 (citing *Hyacinthe v. United States*, No. 05–CV–1363 (KAM)(VVP), 2009 WL 4016518, *12 (E.D.N.Y.2009) ("objective medical findings" are required to prove 90/180 impairment), and *Gualtieri*, 283 F. Supp. 2d at 925 (plaintiff failed to meet burden where "self-serving testimony that she can no longer clean her house or hold her baby for long periods of time [ ] is unsubstantiated")).

### DISCUSSION

### I.    Plaintiff Kang

Kang alleges that as a result of the 2017 accident, she sustained injuries to her head, left shoulder, right knee, lumbar spine, and cervical spine. Pls.' 56.1 Statement of Additional Material

21

Facts ¶ 2–3; Ans. to Interrogs. ¶ 4. Defendants maintain that Kang's physical conditions are preexisting, either the result of degeneration or prior accidents. Defs.' Br. 1. In the alternative, defendants argue that Kang did not sustain "serious injuries" within the definition of the No-Fault Law. *Id.* Because plaintiffs have not carried their burden of showing a genuine dispute of fact that Kang's left shoulder, right knee, lumbar spine, or cervical spine injuries were proximately caused by the 2017 accident, I grant summary judgment for defendants as to those injuries. Summary judgment is denied with regard to Kang's head injuries, because questions of fact remain as to their cause and seriousness.

### A. Summary of Defendants' Evidence

#### i. Head

Dr. Head reviewed relevant portions of Kang's medical history and performed a neurological and psychological examination on October 24, 2019. Report of Dr. Head ("Kang Head Rep."), ECF No. 33-6.[20] He concluded that "Kang has not sustained any permanent neurological or psychiatric condition or disability, relative to the [2017 accident]." *Id.* at 20.

---

[20] Defendants' physician reports, which constitute the bulk of the evidence supporting their motion, are not accompanied by sworn affidavits. *See Yong Qin Luo*, 625 F.3d at 777 ("In support of its [prima facie case], defendant may rely on the unsworn reports by plaintiff's physicians, but must provide evidence from its own physicians in the form of sworn affidavits." (quoting *Barth v. Harris*, No. 00 Civ. 1658(CM), 2001 WL 736802, at *2 (S.D.N.Y. June 25, 2001)); *Ruffin v. Rana*, No. 11 CV. 5406(MHD), 2013 WL 4834368, at *8 (S.D.N.Y. Sept. 4, 2013) (same) (citing *Rivera*, 2012 WL 3132667, at *10). As all but one of them are affirmed under the penalties of perjury, however, I consider those reports admissible for the purposes of this motion. *Ruffin*, 2013 WL 4834368, at *8; *Baytsayeva v. Shapiro*, 868 F. Supp. 2d 6, 19 n.21 (E.D.N.Y. 2012) (citing 28 U.S.C. § 1746 and *Williams v. Elzy*, No. 00 Civ. 5382(HPB), 2003 WL 22208349, at *5 (S.D.N.Y. Sept. 23, 2003)). Dr. Mahalick's neuropsychological report, however, is unsworn, and unlike the other expert reports submitted by defendants, not affirmed under penalty of perjury. *See* Report of Dr. Mahalick ("Kang Mahalick Rep."), ECF No. 33-8. Thus, I do not consider Dr. Mahalick's report here. *See Arenes*, 2006 WL 1517756, at *2 (refusing to consider defendants' radiologist report because it was neither sworn nor subscribed to under penalty of perjury).

A dispute of fact remains as to whether Kang sustained direct head trauma from the 2017 accident. Contrary to her statement to her treating physician, Dr. Gamburg, on January 24, 2018 that she did not sustain direct head trauma or lose consciousness in the 2017 accident, Kang informed Dr. Head that she struck her head and lost consciousness for several minutes. *Id.* at 3; Report of Dr. Gamburg, Defs.' Ex. EE ("Kang Gamburg Rep.") 2, ECF No. 32-33; *see also* Kang Dep. 117:21–24 (Kang testifying that her head hit the headrest and steering wheel during the 2017 accident); NYPD Accident Report, Defs.' Ex. Z ("Accident Rep.") 2, ECF No 32-28 (indicating that "no injuries [were] reported or observed" at the scene of the accident).

After administering a battery of neurological tests, Dr. Head explained that Kang's "neurological examination . . . [was] objectively normal," except for the absence of "ankle jerks," which indicated "peripheral neuropathy, [but not] . . . trauma." Kang Head Rep. 11–12, 15. He determined that "her mental status examination failed to reveal evidence of any cognitive impairment[,]" citing her alert and oriented demeanor, fluent speech, and normal memory, among other indicators. *Id.* at 11.

Dr. Head also detected "evidence of diffuse parietal and occipital cortical atrophy [and] scattered T2 hyperintensities throughout the white matter of the brain" on Kang's October 2018 MRI, but "no evidence of brain injury." *Id.* at 20. Although he noted that "increased T2/FLAIR signal intensities [were] present," he explained that those findings must be "correlate[d] . . . with the SWI[21] images to see if there is any evidence of any hemosiderin accumulation around the T2/FLAIR hyperintensities." *Id.* at 16. Since "[t]here [were] no[ hemosiderin accumulations] in this case," the "normal SWI sequences" indicated that there "was no brain trauma in the [2017 accident]." *Id.* at 16, 30. He qualified his conclusion, however, stating that

---

[21] Susceptibility Weighted Imaging (SWI), an MRI technique.

[t]herefore, these findings are *most likely* due to microvascular disease rather than trauma. The atrophy is real and apparently is mild, but, nonetheless, is present and is difficult to explain, but is *apparently* not related to brain trauma . . . .

*Id.* at 16 (emphases added). In a similar vein, Dr. Head observed that the diffuse cortical atrophy on Kang's brain images is "symmetrical" rather than "relegated to one side or the other." *Id.* at 15. Accordingly, he concluded that "[i]t would be *unlikely* that this would be related to trauma sustained on December 21, 2017." *Id.* (emphasis added). His statements indicate that trauma is an unlikely, but possible, cause of Kang's head injuries.

Dr. Head acknowledged Kang's longstanding diagnosis of bipolar disorder, which caused her to experience recurring manic attacks, has required repeated hospitalizations since 1997, and for which she takes medication consistently. *Id.* at 2, 9. Dr. Head concluded that Kang's bipolar disorder was "under control" and that she presently experienced "no sign . . . of anxiety or depression." *Id.* at 16. He recommended that she "continue her treatment for bipolar disorder, unrelated to her accident." *Id.* at 21. He did not relate her bipolar disorder to her brain atrophy, heightened signal intensities, or other alleged conditions from the 2017 accident.

### ii.    Left Shoulder

Dr. Gidumal physically examined Kang on October 28, 2019. Kang Gidumal Rep. 1. Based on his examination and a review of Kang's related medical records, he prepared a report in which he determined that Kang's left shoulder and right knee injuries were degenerative or preexisted the 2017 accident. *Id.* at 1, 9.

Kang has a history of left shoulder injuries from her 2014 accident. She filed a lawsuit in 2014, alleging that she sustained serious and permanent injuries to her left shoulder as a result of a car accident. *See* 2014 Bill of Particulars ¶ 7 (alleging permanent injury to Kang's left shoulder, including joint effusion and a focal intrasubstance tear involving the subscapularis tendon). Dr. Gidumal asserts that nothing in her record indicates that Kang recovered from those injuries. Kang

24

Gidumal Rep. 8–9.

An MRI of Kang's left shoulder conducted after the 2017 accident on February 5, 2018 showed "evidence of chronic long-standing pathology[,]" but not "acute injuries." *Id.* at 9; MRI of Left Shoulder, Feb. 5, 2018, Defs.' Ex. W ("2018 Kang Left Shoulder MRI"), ECF No. 32-25. Although Dr. Gidumal identified "rotator cuff tendinosis and tendinitis, impingement[,] supraspinatus outlet syndrome[, and a] hypoplastic partially torn labrum" on the MRI, he determined that those conditions were not acute, noting that "[t]here was no bone marrow edema, T2 signal abnormality, bleeding or contusions of the muscle." Kang Gidumal Rep. 9. Additionally, he explained that

> A hypoplastic glenoid is a glenoid that was not formed properly and therefore not a traumatic event. The MRI showed evidence of tendinosis and tendinitis which are age related changes and not acute traumatic injuries. The MRI showed a supraspinatus outlet syndrome which is a developmental, degenerative or congenital condition. It is not traumatic. Therefore, it is my opinion within a reasonable degree of medical certainty that the MRI shows no evidence of any acute injuries from the results of the December 21, 2017 events but rather to chronic long-standing degenerative disease or previous car accidents.

*Id.*

Dr. Gidumal's conclusion was bolstered further by his review of Kang's left shoulder arthroscopic surgery record, which, he asserted, showed no evidence of acute injury. Kang Gidumal Rep. 3–4, 9; Various Records of Consultations with Dr. Seldes, Defs.' Ex. T ("Kang Seldes Consultations") 3–5, ECF No. 32-22. The conditions identified during the arthroscopy included "impingement syndrome, [a Superior Labrum Anterior and Posterior (SLAP)] tear and loose bodies." Kang Gidumal Rep. 9. Dr. Gidumal maintained that these conditions were degenerative, explaining that

> An impingement syndrome is a degenerative, congenital or developmental condition. An impingement is not a traumatic condition. An impingement syndrome causes degeneration of the rotator cuff and labrum. Therefore, it is my opinion within a reasonable degree of medical certainty that there is no evidence of

an acute traumatic injury on the arthroscopic evaluation.

*Id.*[22]

Relatedly, Dr. Gidumal's physical examination of Kang revealed "some subjective complaints of shoulder pain but no object[ive] evidence of an injury." *Id.* Dr. Gidumal determined that Kang had a normal range of motion in her left shoulder.[23] *Id.* at 6–7. He observed no atrophy or swelling, signs of impingement, subdeltoid or scapulothoracic crepitus, instability, or pain or tenderness in her A-C joint. *Id.*

### iii.   Right Knee

As with her left shoulder, Kang's right knee pain dates back to her 2014 accident, on the basis of which Kang filed a lawsuit alleging permanent knee injuries. *See* 2014 Bill of Particulars ¶ 7 (alleging permanent injury to Kang's right knee, including joint effusion, an intrasubstance tear of the body of the medial meniscus, a tear of the medial collateral ligament, and a Grade I meniscal

---

[22] Plaintiffs argue that Dr. Gidumal's report failed to meet its initial burden because he did not address the SLAP tear identified in Kang's arthroscopy. Pls.' Br. 16. First, plaintiffs did not allege a SLAP tear as one of the shoulder injuries claimed by Kang. *See* Pls.' 56.1 Statement of Additional Material Facts ¶ 3. Second, Dr. Gidumal explained that Kang's impingement syndrome caused the tear to her labrum, and thus, adequately addressed the injury.

[23] Dr. Gidumal used the same method to measure range of motion for each medical opinion he prepared in this case. Plaintiffs were instructed to move their relevant body part while Dr. Gidumal measured their voluntary motion using a goniometer. Kang Gidumal Rep. 7; Lee Gidumal Rep. 4; Report of Dr. Gidumal ("Kwon Gidumal Rep.") 4, ECF No. 33-3. This constitutes an active range of motion test.
    Active range of motion testing, which allows a plaintiff greater control of her movements, is less reliable than passive. *Hodder*, 328 F. Supp. 2d at 355; *see also Ventra v. United States*, 121 F. Supp. 2d 326, 334 (S.D.N.Y. 2000) (discounting the importance of the results of an active range of motion test, as compared to a passive test). Despite courts' skepticism of active range of motion testing, however, some have considered such evidence, particularly when plaintiffs' subjective movements are measured using a goniometer or protractor. *See, e.g., Bass*, 2019 WL 6527944, at *1–3 (stating that plaintiff's doctor "objectively measure[d]" plaintiff's flexibility using a goniometer and considering defendant doctor's range of motion test, but noting that his findings were subjective because plaintiff controlled her own movements).

capsular separation of the medial meniscus). At that time, she alleged that her knee injury limited her range of motion, caused her pain, and interfered with her ability to go about her daily life. *Id.*

Dr. Gidumal compared the 2014 and 2018 MRIs of Kang's right knee, concluding that the 2018 MRI "revealed no evidence of any acute changes." Kang Gidumal Rep. 8; MRI of Right Knee, July 30, 2014, Defs.' Ex. G ("2014 Kang Right Knee MRI"), ECF No. 32-9; MRI of Right Knee, May 22, 2018, Defs.' Ex. X ("2018 Kang Right Knee MRI"), ECF No. 32-26. Consistent with the allegations of right knee injury in Kang's 2014 lawsuit, the 2014 MRI "revealed a medial meniscal tear with a grade 1 capsular separation and an MCL tear." Kang Gidumal Rep. 8; 2014 Kang Right Knee MRI. The 2018 MRI showed the same capsular separation as the 2014 MRI. Kang Gidumal Rep. 8; 2014 Kang Right Knee MRI; 2018 Kang Right Knee MRI. In addition, however, it showed myxoid degeneration of the posterior horn of the medial meniscus and a partial ACL tear. Kang Gidumal Rep. 8; 2018 Kang Right Knee MRI. Dr. Gidumal explained that the ACL tear was degenerative because "[t]here was no inflammation, bone marrow edema or signal abnormality consistent with an acute ACL tear." Kang Gidumal Rep. 8. Reinforcing his conclusion, he detected no indication that Kang's right knee injuries were acute from Dr. Seldes's arthroscopic report. Kang Gidumal Rep. 8; Kang Seldes Consultations 10–12.

Consistent with his review of Kang's diagnostic reports, Dr. Gidumal's physical evaluation yielded "evidence of subjective complaints of knee pain but no object[ive] evidence of any traumatic injury[, and] . . . no evidence of any meniscal or ligamentous tears." Kang Gidumal Rep. 8. Although he determined that Kang's right knee range of motion was slightly restricted, he detected no effusion, medial or lateral joint line pain, or valgus or varus instability. *Id.* at 6.[24] Her

---

[24] Kang's right knee range of motion was 0° extension / 130° flexion. Kang Gidumal Rep. 6. A normal range of motion is 0° extension / 150° flexion, indicating a 13.33% decrease. *Id.*

Lachman and anterior and posterior drawer signs were negative, and her McMurray's test was positive for subjective complaints of pain, but negative for objective clunking. *Id.*

Considering this evidence together, Dr. Gidumal concluded that Kang's knee injuries preexisted and were not caused by the 2017 accident, a sufficient showing to meet defendants' initial burden. *Id.* at 8.

### iv.   Lumbar Spine

Dr. Kuflik conducted a physical examination of Kang on October 31, 2019 and prepared a report dated November 18, 2019, assessing the severity and cause of her alleged lumbar and cervical spinal injuries. Report of Dr. Kuflik ("Kang Kuflik Rep.") 1, ECF No. 33. In doing so, Dr. Kuflik reviewed a series of Kang's medical records from 2014 to 2019, expert reports, police reports, Kang's interrogatories, and cervical and lumbar spine MRIs. *Id.* at 3–5.[25] He concluded that Kang's cervical and lumbar spine injuries preexisted the 2017 accident, explaining that she "has complaints of cervical and lumbar spine pain, virtually identical to prior complaints following a motor vehicle accident in 2014 and 2015 for which she received treatment to at least 2016, including injections, chiropractic care, and acupuncture." *Id.* at 6; *see also* Various Kang Med. Recs. 31–40 (documenting evidence of Kang's cervical and lumbar spine injuries in December 2015 and January 2016, such as loss of range of motion, muscle spasms, and positive Spurling tests,[26] as observed by Kang's treating physician, Dr. Xie); Integrated Pain Management Medical

---

[25] In support of their motion, defendants submitted a lumbar spine MRI, stating in their declaration that it was "a true and accurate copy of plaintiff Erin Kang's Lumbar Spine MRI, dated 2/8/2016." *See* Defs.' Ex. N, ECF No. 32-16; Defs.' Decl. ¶ 16, ECF No. 32-2. The MRI itself, however, is regarding "Ju Hee Lee," not Erin Kang. Defs.' Ex. N at 2. Thus, I disregard Defendants' Exhibit N for the purposes of this motion.

[26] "A Spurling [test] is a clinical test that is performed by bending a patient's head backwards and sideways while exerting downward pressure on the head. . . . A positive Spurling Maneuver occurs when the patient indicates that performing the maneuver causes pain that radiates to her

Records, Defs.' Ex. Q ("Add. Dr. Xie Recs."), ECF No. 32-19 (documenting evidence of Kang's cervical and lumbar spine injuries in March and May 2016 and indicating no resolution of her injuries or symptoms). Dr. Kuflik stated that

> There is no objective causally related evidence of an injury to the cervical or lumbar spines as a consequence of this event in excess of a sprain/strain. There is no objective causally related evidence of a disability vis a vis the spine. There is no objective causally related indication for further treatment of the spine.

Kang Kuflik Rep. at 6.

Dr. Kuflik reported that his physical examination of Kang's lumbar spine was "unremarkable." *Id.* Besides Kang's subjective complaints of pain, Dr. Kuflik detected no paraspinal muscle spasm or atrophy. *Id.* at 3. He conducted several objective tests and identified no abnormalities, noting only that plaintiff refused to perform the Flexion, Abduction, and External Rotation (FABERs) test due to subjective complaints of knee pain. *Id.* (finding no positive results on upper and lower extremity motor examinations, straight leg raising test,[27] and Hoffman, Babinski, Spurling, and clonus tests). Dr. Kuflik also noted that Kang's lumbar spine range of motion was "minimally restricted by complaints of pain."[28] *Id.* at 2–3.

---

extremities, and indicates an underlying injury to the neck, such as a slipped disc or pinched nerve." *Rivera*, 2012 WL 3132667, at *19 n.44 (citations omitted). A Spurling test is considered an "objective medical test[.]" *Id.* at *24.

[27] "A straight-leg-raise test is used to indicate w[h]ether the patient has an injury to the lumbar spine, such as a slipped disc or pinched nerve. It does not typically indicate injury to the cervical spine." *Rivera*, 2012 WL 3132667, at *2 n.7. New York case law "has consistently treated straight-leg raising tests as objective evidence of serious injury." *Tsveitel v. Geoghegan*, No. 05–CV–5721, 2009 WL 2182379, at *5 (E.D.N.Y. July 21, 2009) (quoting *Kim v. Cohen*, 208 A.D.2d 807, 807 (N.Y. App. Div. 1994)).

[28] Based on an active range of motion test aided by a goniometer for measurement, Dr. Kuflik determined that Kang had no abnormal range of motion limitations to her lumbar spine, citing the following measurements:

An MRI of Kang's lumbar spine performed on January 26, 2018 revealed "normal alignment of the spine with maintenance of the disc heights" and no nerve root compression. *Id.* at 5. Dr. Kuflik did not contest an earlier assessment by Dr. Xie, which concluded that the 2018 lumbar spine MRI revealed "straightening of the lumbar lordosis." *Id.* at 6; MRI of the Lumbar Spine, Jan. 26, 2018 ("2018 Kang Lumbar Spine MRI"), Defs.' Ex. DD, ECF No. 32-32.

Although Dr. Kuflik does not compare Kang's MRI to any previous images of her lumbar spine,[29] the Bill of Particulars from Kang's 2014 lawsuit outlined, in detail, substantially similar lumbar spine injuries. 2014 Bill of Particulars ¶ 7 (alleging that Kang's 2014 accident caused "reversal of the lumbar lordosis . . . [c]entral herniated disc at the L4-5 level[, and v]entral bulging at L5-S1"); *see also* Kang Seldes Rep. 10; 2014 Kang Lumbar Spine MRI. He also noted that following Kang's 2015 accident, Dr. Xie treated her for neck and lower back pain in 2015. Kang Kuflik Rep. 4; Various Kang Med. Recs. 31; *see also* Records of Thomas Lai, D.C., Defs.' Ex. S

|  | Kang's Lumbar Spine | Normal |
|---|---|---|
| Flexion | 60° | 60° |
| Extension | 30° | 25° |
| Lateral Right Bending | 20° | 25° |
| Lateral Left Bending | 20° | 25° |
| Rotation to the Right | 30° | 30° |
| Rotation to the Left | 30° | 30° |

*Id.* at 2–3. Although Dr. Kuflik classifies Kang's range of motion restriction as "minimal," relevant caselaw has "generally found that a limitation of twenty percent or more is significant for summary judgment purposes." *Hodder*, 328 F. Supp. 2d at 356 (collecting cases). Here, he reported that Kang's lateral right and left bending is restricted by 20%.

[29] Defendants submitted an MRI of Kang's lumbar spine conducted on August 6, 2014, which diagnosed a "reversal of the lumbar lordosis[,]" a "central herniated disc at the L4-5 level[,]" and "ventral bulging at L5-S1." MRI of the Lumbar Spine, Aug. 6, 2014 ("2014 Kang Lumbar Spine MRI"), Defs.' Ex. F, ECF No. 32-8. Dr. Kuflik does not list this unsworn MRI report among those that he reviewed to prepare his medical opinion, but plaintiffs' expert, Dr. Seldes, does. *See* Kang Seldes Rep. 8, 10 (affirming that Kang's 2014 lumbar spine MRI shows "disc herniation at L4-L5 and disc bulging at L5-S1"). Thus, I consider it for the purposes of this motion.

("Kang Lai Recs.'") 2, ECF No. 32-21. She was still experiencing "significant spine symptoms" on March 14, 2016. Kang Kuflik Rep. 4.

>    **v.    Cervical Spine**

Justifying his conclusion that Kang's cervical spine injuries were not caused by the 2017 accident, Dr. Kuflik noted that his physical examination of Kang's cervical spine, like her lumbar spine, was "unremarkable," *id.* at 6, although Kang's range of motion was slightly restricted. *Id.* at 2–3.[30]

He also reviewed two MRIs of Kang's cervical spine—one before and one after the 2017 accident—and determined that both demonstrated multilevel mild degenerative changes and a right-sided disc herniation at C5-C6. *Id.* at 4–5; MRI of the Cervical Spine, Feb. 8, 2016, Defs.' Ex. M ("2016 Kang Cervical Spine MRI"), ECF No. 32-15; MRI of the Cervical Spine, Jan. 26, 2018, Defs.' Ex. CC ("2018 Kang Cervical Spine MRI"), ECF No. 32-31. He explained that there were "no significant changes" between the pre- and post-2017 accident MRIs. Kang Kuflik Rep. 5–6. Dr. Head's analysis of Kang's pre- and post-accident MRIs is consistent with Dr. Kuflik's. Dr. Head explained that an identical C5-C6 disc herniation appears on both films, showing that it

---

[30] Dr. Kuflik recorded Kang's cervical spine range of motion as follows:

|  | Kang's Cervical Spine | Normal |
|---|---|---|
| Flexion | 45° | 50° |
| Extension | 45° | 60° |
| Lateral Right Bending | 40° | 45° |
| Lateral Left Bending | 40° | 45° |
| Lateral Right Rotation | 80° | 80° |
| Lateral Left Rotation | 80° | 80° |

Kang Kuflik Rep. 2–3. This finding does not undermine Dr. Kuflik's assessment that Kang's cervical spine injuries are unrelated to the 2017 accident because he explained that Kang's MRIs indicate that her injuries preexisted the accident.

predated the 2017 accident, and noted that "[t]he other pathologies seen on the earlier films have apparently resolved" in Kang's 2018 MRI. Kang Head Rep. 13–14, 18, 20.

In addition to his assessment of Kang's MRIs, Dr. Kuflik reviewed records of a percutaneous cervical discectomy performed on the C5-6 level of her cervical spine on July 14, 2018. *Id.* at 5. He determined that "[t]here was no objective indication the surgery performed was causally related to the alleged motor vehicle accident of 12/21/2017." *Id.* at 6.

## B. Summary of Plaintiffs' Evidence

### i. Head

Dr. Golzad conducted an in-person consultation with Kang on September 26, 2018 and, nearly a year later, prepared a report based on his examination, Kang's October 2018 brain MRI, and a neuropsychological evaluation performed by Dr. Schweiger on April 26, 2019.[31] Kang Golzad Rep. 6–7. Both Dr. Schweiger's assessment and the October 2018 MRI were conducted after Kang was involved in a subsequent car accident on August 13, 2018, for which Kang initiated another lawsuit under New York's No-Fault Law. Defs.' 56.1 ¶ 24; Pls.' 56.1 ¶ 24; 2018 Bronx Cty. Compl.

Reciting Kang's relevant medical history in his report, Dr. Golzad stated that she sustained a concussion and lost consciousness in a prior motor vehicle accident, which occurred when Kang was in high school. *Id.* at 6; *see also* Kang Head Rep. 6, 29 (indicating that Kang was involved in a motor vehicle accident in 1989 in which she lost consciousness). He also acknowledges that Kang was diagnosed with bipolar disorder following her accident in high school, for which she

---

[31] Although Dr. Golzad's report states that Dr. Schweiger's evaluation took place in August 2019, because Dr. Golzad's report was prepared on July 14, 2019, I consider this a typographical error. Kang Golzad Rep. 7. Dr. Head's report indicates that it was conducted on April 26, 2019. Kang Head Rep. 30.

takes Abilify. Kang Golzad Rep. 6. Her dosage increased after the 2017 accident. *Id.*

Kang complained of frequent "headaches, tinnitus, dizziness, loss of balance, memory and cognitive difficulties" following the 2017 accident, and an evaluation of Kang's cognitive abilities indicated that she had difficulty with attention, concentration, memory, and recall. *Id.*[32] Dr. Schweiger's report stated that "[t]he patient's symptom presentation and her performance on this neurobehavioral screening are consistent with behavior and functioning typically observed among patients who have experienced brain trauma." *Id.* at 10.[33] Explaining that a previous traumatic brain injury may have made Kang more vulnerable to a second brain trauma, Dr. Schweiger's report stated that "in the absence of other factors which could explain the present results, it can be stated with a reasonable degree of neuropsychological certainty that [Kang's] decline is due to the

---

[32] Dr. Golzad's report does not specify whether he observed these deficiencies in his examination, or whether he was summarizing Dr. Schweiger's findings. *See id.* at 8–10 (stating that "formal testing" of Kang's cognitive function showed a decline in her executive functions, working memory, memory, attention and concentration, verbal retrieval, and information processing speed).

[33] Defendants oppose the use of Kang's brain MRI report, arguing that it relies on allegedly unreliable Diffusion Tensor Imaging (DTI) technology. *See* Defs.' Br. 27, 43. The relevant MRI, however, relies on several methodologies, including NeuroQuant, Magnetic Resonance Venography (MRV), and DTI. *See* Various Kang MRI Reports 2–4. In support of their argument, defendants point to Dr. Mahalick's inadmissible report, in which he opines on the "pros[ ]and cons" of DTI testing in the literature. *See, e.g.*, Kang Mahalick Rep. 60–61. Additionally, they rely on one New York Supreme Court case, decided under the *Frye* standard, which determined that "DTI d[id] not (at the time of this writing) have a general acceptance to be used as the standard in clinical/medical treatment of individual patients who are being treated for TBI[s]." *Brouard v.* Convey, 70 N.Y.S.3d 820, 823 (N.Y. Sup. Ct. 2018). Other federal courts, however, have determined that DTI technology is reliable for detecting traumatic brain injury under the *Daubert* standard. *See, e.g.*, *Andrew v. Patterson Motor Freight, Inc.*, No. 6:13CV814, 2014 WL 5449732, at *8 (W.D. La. Oct. 23, 2014); *Ruppel v. Kucanin*, No. 3:08-CV-591, 2011 WL 2470621, at *7 (N.D. Ind. June 20, 2011). Defendants' own expert, Dr. Head, considers the evidence generated by the DTI tests, but chooses to weight the results of a different test, the SWI, more heavily. *See* Kang Head Rep. 15. Thus, I do not accept defendants' argument that Dr. Golzad's report should be disregarded on this basis for the purposes of summary judgment, although I do not bar it at later stages in the litigation.

injury of record." *Id.* Dr. Schweiger's findings were consistent with Kang's October 2018 brain MRI, on the basis of which her radiologist concluded that her injuries were "most compatible with [traumatic brain injury (TBI)]." *Id.* at 7.

Engaging in no independent analysis, Dr. Golzad concluded that Kang suffered a traumatic brain injury from her 2017 accident, which exacerbated "pre-exist[ent] neuropsychiatric symptoms" and caused headaches, a mood disorder, and memory and cognitive deficits. *Id.* at 11.

### ii.   Left Shoulder, Right Knee, Lumbar and Cervical Spine

Dr. Seldes produced a conclusory report regarding the cause of Kang's shoulder, knee, lumbar spine, and cervical spine injuries, in which he acknowledged that Kang had preexisting injuries to her right knee, lumbar spine, and cervical spine from prior accidents. Kang Seldes Rep. 8–11. He conducted a physical examination and reviewed relevant portions of her medical records. *Id.* at 8. Dr. Seldes recorded Kang's range of motion for each body part, but failed to indicate how he conducted the test. *Id.* at 9. He also reported that Kang experienced muscle spasms in her cervical spine and lumbar spine, but did not explain which test he used to detect the spasm.[34] *Id.*

Dr. Seldes reviewed Kang's various MRIs from before and after the 2017 accident and described her preexisting cervical spine, lumbar spine, and right knee injuries. *Id.* at 9–10. For example, he explained that Kang's 2016 cervical spine MRI showed "disc herniations from C3-C7[,]" and that the corresponding 2018 MRI showed only "a herniation from C5 to C6[.]" *Id.* at 10. With regard to Kang's right knee, he stated that her 2014 MRI showed a medial meniscal tear,

---

[34] "Although medical testimony concerning observations of a spasm can constitute objective evidence in support of a serious injury, the spasm must be objectively ascertained. This requirement was not satisfied by the testimony of plaintiff's expert that he detected a spasm, where he did not, for example, indicate what test, if any, he performed to induce the spasm." *Toure*, 774 N.E.2d at 1205.

grade 1 capsular separation, and an MCL tear. *Id.* The 2018 MRI was substantially similar, also showing a medial meniscal tear and meniscal capsule separation, in addition to a partial ACL tear and bone island inflammation of the distal femur. *Id.* Although he acknowledged that Kang had preexisting conditions from prior car accidents, he did not explain how he determined that her current injuries were aggravated by the 2017 accident. *Id.* at 10–11.

Rather, he concludes, without further analysis, that "[a]fter reviewing the records and examining the patient, it is my medical opinion that the C-spine, lumbar spine, left shoulder, and right knee are directly involved and related to the [2017 accident.]" *Id.* at 11.[35] He asserted that "from history, physical exam, and MRI reports, [Kang's preexisting] injuries were exacerbated by the [2017 accident]." *Id.* His only documented justification for this conclusion is Kang's statement to him that "although she had previously injured her C-spine, L-spine, and Right knee in prior accidents, they were doing well after physical therapy and treatment and were exacerbated by the [2017 accident]." *Id.* at 9. Notably, he did not conclude that Kang suffers from permanent structural damage to the lumbar spine at all. *See id.* at 11 ("The patient has some permanent structural damage in the C-spine from the herniation, in the left shoulder from rotator and labral tear, and in the right knee from the meniscal tears and chondral injury. . . . [A]nd the patient has reached maximum medical improvement."); *id.* (concluding that Kang suffers from "disc bulging and herniations" on her lumbar spine, which are "improving").

## C. Causation of Kang's Injuries

Defendants established their prima facie case that Kang's left shoulder, right knee, lumbar spine, and cervical spine injuries were caused by preexisting injuries and degeneration, rather than

---

[35] Dr. Seldes's orthopedic consultation reports provide minimal additional information, none of which pertains to causation. Consultation Reports of Dr. Seldes, Pls.' Ex. B ("Kang Seldes Consultation Reps.") 2–7, ECF No. 38-3.

the 2017 accident. *See Boyarski v. Karczewski*, No. 17-CV-6282 FPG, 2019 WL 3816560, at *3 (W.D.N.Y. Aug. 14, 2019) (determining that initial burden was established by physician reports concluding from post-accident MRIs that plaintiff's injuries were degenerative, as well as evidence that plaintiff complained of arthritic pain before the accident and did not report pain to treating doctors on the day after the accident); *Gay*, 2011 WL 2015528, at *3, *5–6 (finding initial burden satisfied by defendant doctors' determination that plaintiff's post-accident MRIs and physical examination revealed only degenerative disc disease and long-standing pathology); *Rhone*, 2007 WL 3340836, at *7–8 (finding that defendant doctor's report satisfied initial burden where he identified degenerative conditions on pre-accident MRIs and noted that plaintiff complained of similar symptoms following a prior accident); *Kerr v. Klinger*, 896 N.Y.S.2d 868, 868–69 (N.Y. App. Div. 2010) ("Defendant established her prima facie entitlement to summary judgment by submitting evidence, including the affirmed reports of a radiologist, who, upon reviewing the MRI films taken after plaintiff's accident, concluded that the disc bulges and/or herniations revealed therein were the result of degenerative disc disease and not caused by the automobile accident at issue.").

For each body part, Drs. Gidumal and Kuflik relied on objective evidence, such as MRI films and arthroscopic surgery photographs, to determine that Kang sustained no acute injuries in the 2017 accident. *See* Parts I.A.ii–v. They both explained the basis for their conclusions—for example, by comparing pre- and post-accident MRIs in the case of Kang's right knee and cervical spine. Where there were no pre-accident MRIs to compare to Kang's 2018 MRI films, as was the case with Kang's lumbar spine and left shoulder injuries, Drs. Gidumal and Kuflik explained how the post-accident films and arthroscopic records lacked indicators of traumatic injury and pointed to pre-accident medical records and Kang's 2014 Bill of Particulars, which alleged substantially

similar injuries and did not show that she had recovered from her prior injuries. Taken together, this evidence satisfies defendants' initial burden for all but Kang's head injuries.

Dr. Head's medical opinion, however, is insufficient to shift the burden from defendants to plaintiffs with regard to causation because it does not rule out traumatic brain injury as a cause of Kang's brain conditions. *See Baytsayeva*, 868 F.Supp.2d at 26 (finding medical expert's report inconclusive as to causation where he opined that plaintiff's injury could be traumatic or degenerative in nature and that a trauma-induced injury was "unlikely"); *cf. Valentin*, 873 N.Y.S.2d at 184 (determining that defendants met prima facie burden where radiologist's report stated that there was "no evidence of post-traumatic injury"). Dr. Head determined that although Kang experienced brain atrophy and T2 hyperintensities, her medical record and his examination showed "no evidence of brain injury." Kang Head Rep. 20. In addition to this definitive statement, however, he opined that

> these findings are *most likely* due to microvascular disease rather than trauma. The atrophy is real and apparently is mild, but, nonetheless, is present and is difficult to explain, but is *apparently* not related to brain trauma, as the SWI images show no evidence of any hemosiderin accumulation within the cerebral hemispheres.

*Id.* at 16 (emphases added). His statements leave open the possibility, albeit unlikely, that brain trauma caused Kang's head injuries—and thus, raise a triable issue of fact. At summary judgment, such equivocal statements are insufficient to carry defendants' initial burden as to causation.

Furthermore, contrary to defendants' assertions, Dr. Head did not show that Kang's bipolar disorder constituted a preexisting condition explaining the full scope of Kang's alleged neurological symptoms. In fact, Dr. Head opined that her bipolar disorder was "under control" and that she should continue her current treatment plan, unrelated to the 2017 accident. Additionally, her 1989 high school car accident, which occurred approximately twenty-eight years earlier and resulted in brain injury and loss of consciousness, is not persuasive evidence of a preexisting

37

condition. *See Perpall*, 2017 WL 1155764, at *22 (finding evidence that plaintiff underwent back surgery twenty-four years before relevant accident unpersuasive that plaintiff's back injuries were not caused by the accident (citing *Evans*, 978 F. Supp. 2d at 167) (finding evidence concerning plaintiff's forty-year-old injury not persuasive enough to be considered a pre-existing condition)).

Because defendants did not meet their initial burden as to Kang's head injuries, the burden does not shift to plaintiffs to demonstrate a genuine issue of fact as to the cause of those injuries.[36] The burden does shift to plaintiffs, however, with regard to Kang's right knee, lumbar spine, and cervical spine injuries. Plaintiffs failed to introduce evidence satisfying their burden.

Without further explanation, the avowal of plaintiffs' medical expert, Dr. Seldes, that Kang's preexisting injuries were exacerbated by the 2017 accident is insufficient to carry plaintiffs' burden. Kang Seldes Rep. 9, 11. "[T]o the extent that the [p]laintiff is claiming that the [relevant] accident aggravated asymptomatic pre-existing conditions, the [p]laintiff is required to provide objective evidence that distinguishes aggravation of a pre-existing condition from the pre-existing condition itself." *Evans*, 978 F. Supp. 2d at 172 (citing *Dabiere v. Yager*, 748 N.Y.S.2d 38, 39 (N.Y. App. Div. 2002) ("[I]n the absence of objective evidence establishing the aggravation as opposed to the underlying condition, plaintiffs' submission is insufficient to demonstrate serious injury[.]")); *see also Perpall*, 2017 WL 1155764, at *19–20 (finding that plaintiff medical expert's

---

[36] Although plaintiffs need make no showing of causation here, the paucity of plaintiffs' evidence establishing that the 2017 accident caused Kang's head injuries makes it highly unlikely that they will prevail at trial. For example, they have adduced no evidence of Kang's alleged head injury contemporaneous with the 2017 accident. *See, e.g.*, *Alvarez*, 2012 WL 4094828, at *6 (explaining that "a lack of contemporaneous evidence" of plaintiff's injury undermines her attempt to prove causation); *see also* Kang Head Rep. 25–29 (explaining that Kang's medical records show that she did not complain of head trauma from the 2017 accident until her consultation with Dr. Golzad on September 26, 2018). Nevertheless, because defendants' evidence was insufficient to shift the burden of proof, I do not grant summary judgment for Kang's head injuries on the basis of causation.

opinion failed to rebut defendants' showing because "[h]e simply makes the statement that the . . . accident exacerbated [plaintiff's] pre-existing condition . . . without explaining what exactly that exacerbation is or on what basis he concluded that such exacerbation had occurred"); *Arenes*, 2006 WL 1517756, at *9 (finding that plaintiffs did not carry burden where plaintiffs' doctor did not address defendants' doctor's report determining that injuries were degenerative or preexisting, and where plaintiff doctor "does not explain what leads her to th[e] finding" that "plaintiffs' injuries are causally related to the Accident"). Although Dr. Seldes reported that Kang experienced a loss of range of motion and various muscle spasms, he did not rebut defendants' showing that Kang's injuries predated the 2017 accident. *See Boyarski*, 2019 WL 3816560, at *3–4 (finding that plaintiff who did not "present evidence addressing the pre-existing injuries" to rebut defense doctors' theory of causation did not carry burden); *Perpall*, 2017 WL 1155764, at *19 (determining that plaintiff's medical expert's opinion was conclusory, and thus, insufficient to meet plaintiffs burden because it lacked "any elaboration on [plaintiff's] supposed recovery from the conditions and impairments she suffered as a result of [her previous accident].").

Furthermore, Dr. Seldes's findings as to Kang's range of motion carry little weight because he did not specify the method that he used to measure it. He concluded that Kang's range of motion was restricted for each region "without any explanation as to how he tested [p]laintiff's range of motion or any indication that his conclusion was based on objective medical tests." *Gay*, 2011 WL 2015528, at *7 (citing *Mercado v. Lee*, No. 04 Civ. 7166(PGG), 2008 WL 4963985, *3 (S.D.N.Y. Nov. 21, 2008) (holding that expert's conclusion that plaintiff's range of motion was restricted was insufficient absent any explanation as to how plaintiff's range of motion was tested)); *Hodder*, 328 F.Supp.2d at 357 (stating that plaintiff's doctor's findings are "not particularly useful to this Court because he never clarified whether the tests he conducted to elicit these results were passive

or active range of motion tests"). Because plaintiffs have failed to demonstrate a genuine dispute of fact as to the cause of Kang's shoulder, knee, lumbar spine, and cervical spine injuries, defendants are entitled to summary judgment on those claims.

### D.  Serious Injury as to Kang

Kang's claims regarding her head injuries survive summary judgment because she has raised a dispute of fact as to whether she sustained a "significant limitation of use of a body function or system," but not a "permanent consequential limitation of use of a body organ or member." Defendants met their initial burden of showing that Kang had no head injury or had recovered from it. Although Dr. Head conceded that Kang's MRI indicated brain atrophy, he concluded, based on neurological testing, that it was not a result of traumatic brain injury and that she manifested no cognitive impairments limiting her brain function. Her memory, concentration, and comprehension were within a normal range. *See* Kang Head Rep. 11.

As a preliminary matter, at no point in Dr. Golzad's report did he conclude that Kang's injuries were permanent, stating only that she suffered traumatic brain injury from the 2017 accident. Kang Golzad Rep. 11; *see Brusso*, 699 F. Supp. 2d at 582 (explaining that doctor's report was "fatal[ly] inadequa[te]" where it did "not even reflect an opinion that [plaintiff] has suffered a permanent or significant limitation"). With no expert opinion concluding that Kang's head injuries are permanent, I do not find that plaintiffs have met their burden as to a "permanent consequential limitation."

Nevertheless, plaintiffs adduced sufficient evidence to overcome summary judgment with regard to the "significant limitation" category by proffering the results of Dr. Schweiger's neuropsychological evaluation, incorporated through Dr. Golzad's report. *See Flanders v. Nat'l Grange Mut. Ins. Co.*, 1 N.Y.S.3d 542, 545 (N.Y. App. Div. 2015) ("Multiple mild cognitive

impairments may be sufficient to demonstrate the existence of serious injury in the significant limitation of use category when they result in a combined impact that limits one's ability to perform daily life functions[.]"). Kang's score on the Montreal Cognitive Assessment (MOCA) battery indicated a "mild decline" in her cognition, although it is unclear which doctor performed Kang's test, and on what date. Kang Golzad Rep. 8 (indicating that Dr. Schweiger performed the test); Kang Head Rep. 29 (including Kang's MOCA test results in Dr. Golzad's report summary). Dr. Schweiger also administered an Integrated Visual and Auditory Attention Test (IVA-2), from which he concluded that Kang's auditory attention and auditory sustained attention were "extremely impaired" and her visual attention "mildly impaired." Kang Golzad Rep. 8. Based on the NeuroTrax Cognitive Assessment battery, Kang's memory was deemed "impaired" and her executive function, verbal function, and global cognitive abilities "low average." *Id.* at 9. Together with evidence of brain atrophy on her MRI, administered approximately six months prior to Dr. Schweiger's cognitive testing, plaintiffs have adduced sufficient evidence to raise a genuine dispute of fact as to whether Kang's brain injuries constitute a "significant limitation." Because this finding precludes summary judgment as to Kang's alleged head injuries, I need not assess her 90/180 standard claim here.

## II.   Plaintiff Lee

Lee alleged that he sustained injuries to his left knee, lower back, and neck as a result of the 2017 accident. *See supra* Factual Background, Part II.A. Defendants argue that Lee's medical conditions are degenerative, rather than acute, and thus were not caused by the accident. Defs.' Br. 30–31. In the alternative, defendants argue that Lee's injuries are not serious as defined by the No-Fault Law. *Id.* I find that defendants are entitled to summary judgment on causation grounds for Lee's alleged lumbar spine and left knee injuries. As defendants did not meet their

41

initial burden with regard to the cause or seriousness of Lee's alleged cervical spine injuries, summary judgment for those injuries is denied.

### A. Summary of Defendants' Evidence

Defendants' medical expert, Dr. Gidumal, examined Lee on October 14, 2019 and reviewed a selection of his treatment records and diagnostic studies, including post-accident medical records, left knee arthroscopy records from March 16, 2018, and post-accident MRIs of the lumbar and cervical spine, conducted on February 16, 2018 and of the left knee, conducted on January 26, 2018. Lee Gidumal Rep. 1–3, 5.

#### i. Left Knee

After reviewing Lee's left knee MRI, photographs from his arthroscopic surgery, select medical records, and conducting a physical examination, Dr. Gidumal concluded that "any abnormality present on the left knee cannot be related to the [2017 accident]." *Id.* at 6. He explained that "[t]here is no evidence of any acute injuries to the left knee," and that Lee's left knee injuries were "old." *Id.* at 5.

Explaining his conclusion that Lee's knee injuries were degenerative, Dr. Gidumal noted that the left knee arthroscopic photographs showed "evidence of degeneration of the condyles" and "no traumatic chondral defects." *Id.* at 5. In those photographs, "[t]he [ACL] was intact," there was no meniscal capsular separation laterally, and "[t]here was evidence of degeneration of the medial and lateral menisci," but not acute injury. *Id.* Consistent with the arthroscopic photographs, he explained that the MRI offered "no evidence that these were acute injuries[,]" noting that "[t]here was no hemarthrosis" and "no kissing lesions on the lateral femoral condyle/lateral tibial plateau." *Id.*

During his physical examination of Lee, Dr. Gidumal observed that Lee walked without a

cane or limp, had no effusion in his knee joints, no valgus or varus instability, and no crepitus in either knee. *Id.* at 3. Although Lee complained of medial joint line pain on both knees, Dr. Gidumal recorded a normal range of motion in each based on active range of motion testing. *Id.* To evaluate Lee's alleged ACL tear, Dr. Gidumal conducted the Lachman test and noted that anterior and posterior drawer signs were negative. *Id.*[37]

### ii.     Lumbar Spine

Based on his review of Lee's medical records, radiographic studies, and physical examination, Dr. Gidumal concluded that "there is no medical evidence that Mr. Lee sustained any acute back injury." *Id.* at 5. Dr. Gidumal identified no abnormal conditions with regard to Lee's lumbar spine. During his physical examination, the various objective tests were negative and Dr. Gidumal observed no gross abnormalities, pelvic rotation, scoliosis, leg length deficiencies, palpable spasms or active trigger points. *Id.* at 3. He determined that Lee's range of

---

[37] Plaintiffs assert that Dr. Gidumal's report is "arbitrary and cursory" because he failed to conduct a "necessary objective test[,] such as McMurray's test[,] to assess Plaintiff Lee's left knee meniscus tear injury." Pls.' Br. 26 (citing *Junco v. Ranzi*, 288 A.D.2d 440, 440 (N.Y. App. Div. Nov. 25, 2001) (affirming lower court's denial of summary judgment for defendants because "[t]he affirmed report of the defendants' medical expert did not set forth the objective tests he performed during his examination of the plaintiff which led him to conclude that the plaintiff suffered no limitation to the range of motion in his neck or back")). Plaintiffs cited no case law indicating that McMurray's test is the only type of objective evidence on which a medical expert may rely. *See Jones v. United States*, 408 F. Supp. 2d at 114 n.12 (explaining that objective medical findings "greatly limit or alleviate the patient's participation . . . . Examples of objective tests are as follows: reflex tests, measuring atrophy, an MRI or an X–ray") (internal citation omitted). In *Toure*, the New York Court of Appeals explained that "MRI and CT scan tests and reports" can constitute objective evidence of a medical condition. 774 N.E.2d at 1202, 1205.

Here, Dr. Gidumal's opinion relied on Lee's post-accident treatment history, multiple photos from Lee's left knee arthroscopic surgery, MRIs of Lee's left knee, and atrophy assessments, in addition to active range of motion testing. Although Dr. Gidumal did not indicate that he used McMurray's test to evaluate Lee's alleged meniscal tear, plaintiffs have not shown that Dr. Gidumal's omission of the McMurray test discredits his examination and medical opinion.

motion and lower extremity motor function were both normal. *Id.* Although Lee had "subjective complaints of pain," he explained, there was "no evidence of any neurologic deficits, sensory abnormalities, loss of reflexes[,] or atrophy." *Id.* at 4–5.

According to Dr. Gidumal, "[t]he MRI showed evidence of longstanding degenerative disease of the lumbar spine" because "[t]here was evidence of loss of signal height and diffuse disc herniations with facet arthrosis and Ligamentum hypertrophy. The changes had been going on for so long that there were endplate changes within the vertebra." *Id.* at 4.[38] The MRI lacked indicators of acute injury, such as "annular tears, bleeding, bone marrow edema or T2 signal abnormality." *Id.* Additionally, Dr. Gidumal concluded that the electromyography (EMG) of Lee's lower extremity was "nondiagnostic," as it presented no abnormalities consistent with acute injury. *Id.* at 5.

### iii.    Cervical Spine

As with Lee's lumbar spine, Dr. Gidumal also concluded that the cervical spine MRI revealed "no evidence of any acute traumatic injury." *Id.* at 4. He did not contest the radiologist's conclusion that the MRI demonstrated "[m]ultilevel loss of disc height and signal. C3 – 4, C4 – 5, C5 – 6 and C6 – 7 central and diffuse 8 mm disc herniations with central spinal stenosis." *Id.* at 2, 4. Rather, he explained that "[t]he MRI also showed evidence of long-standing degenerative disc disease with facet arthrosis and Ligamentum flavum hypertrophy and multilevel loss of disc signal and height." *Id.* at 4. In his opinion, "in addition to these chronic changes there were no

---

[38] Plaintiffs urge me to disregard Dr. Gidumal's report because, although he notes disc herniations in Lee's lumbar spine, they claim that he opines without explanation that Lee's lumbar spine MRI only reveals degenerative conditions. Pls.' Br. 26–27; *see* Lee Gidumal Rep. 4. Contrary to plaintiffs' assertion, however, Dr. Gidumal explained that endplate changes on Lee's lumbar spine indicated degenerative, rather than acute, injury. Lee Gidumal Rep. 2, 4.

acute changes noted" on the MRI, as evidenced by that lack of "bone marrow edema, T2 signal abnormality or bleeding." *Id.* This conclusion, however, is limited to Dr. Gidumal's assessment of Lee's cervical spine MRI. It does not reflect his findings from his physical examination or Lee's medical history.

In his physical examination, Dr. Gidumal reported a decreased range of motion in Lee's cervical spine. *Id.* at 4 (reflecting a 25% decrease in right and left lateral rotation and 33% decrease in right and left lateral bending).[39] Nevertheless, Lee's reflexes were normal, he had no detectable muscle spasm, and his Spurling and cervical compression tests were negative. *Id.* at 3.

Unlike his analysis of Lee's lumbar spine and left knee, however, Dr. Gidumal does not state a final conclusion as to the cause of Lee's cervical spine injuries. *See id.* at 5 (stating that "it is my opinion within a reasonable degree of medical certainty that there is no medical evidence that Mr. Lee sustained any acute back injury," but failing to provide a general conclusion as to Lee's alleged neck injury).

### B.  Summary of Plaintiffs' Evidence

On June 4, 2019, Dr. Thomas Scilaris prepared a report on Lee's medical conditions following three medical evaluations he conducted on February 5, 2018, September 5, 2018, and

---

[39] Dr. Gidumal recorded Lee's cervical spine range of motion as follows:

|  | Lee's Cervical Spine | Normal |
|---|---|---|
| **Flexion** | 50° | 50° |
| **Extension** | 60° | 60° |
| **Lateral Right Bending** | 30° | 45° |
| **Lateral Left Bending** | 30° | 45° |
| **Lateral Right Rotation** | 60° | 80° |
| **Lateral Left Rotation** | 60° | 80° |

*Id.* at 4. He measured Lee's voluntary movements using a goniometer. *Id.*

45

June 4, 2019. Lee Scilaris Rep. 8–9. He reviewed Lee's post-accident MRIs, EMG results, and post-accident medical reports, concluding that Lee's injuries were caused by the 2017 accident. *Id.* at 8–10.[40]

### i.    Left Knee

In his initial physical examination of Lee on February 5, 2018, plaintiff's expert, Dr. Scilaris, reported "some mild crepitus with equivocal McMurray's" in addition to Lee's subjective complaints of pain. *Id.* at 9. His review of Lee's MRI "revealed meniscal capsule separation [and l]ateral meniscus with a partial ACL tear." *Id.*[41] He noted that Lee had a limited range of motion in his left knee, not specifying how he measured range of motion, as well as atrophy in his quadriceps and adductor musculature. *Id.* at 10. Although Dr. Scilaris concluded that all of the injuries noted in his report were caused by the 2017 accident, he did not explain how he determined that the conditions identified on the MRI indicated an acute, rather than a degenerative, injury. *See id.* at 10–11.

### ii.    Lumbar Spine

Dr. Scilaris's consultation summaries indicate that Lee did not complain of injuries to the lumbar spine in either of his first two visits to Dr. Scilaris's office on February 5, 2018 and

---

[40] Dr. Scilaris stated that "with a reasonable [degree] of medical probability, there is a direct causal relationship between the [2017 accident], and the injuries described above." Lee Scilaris Rep. 10. It is unclear, however, whether he is referring to all of the injuries referenced in his opinion or only the injuries included in his relatively short "diagnosis" section. *See id.* His "diagnosis" includes a much more limited list of conditions, namely: "Cervical herniated nucleus pulposus[;] Lumbar herniated nucleus pulposus[; and] Status post arthroscopy performed by Dr. Wert, synovectomy, chondroplasty, medial and lateral meniscectomy and lysis of adhesions." *Id.* For the purposes of this motion, I assume that he refers to his entire discussion of Lee's injuries.

[41] Dr. Scilaris again reviewed Lee's left knee MRI on June 4, 2019. On that date, he stated that the MRI revealed a "tear of the body of the medial meniscus, lateral meniscus, as well as posterior horn of medial meniscus with meniscal capsulate separation laterally." *Id.*

September 5, 2018. *Id.* at 9. On his third visit on June 4, 2019, Dr. Scilaris reviewed Lee's MRI

results from February 16, 2018, stating that they showed "grade I to II spondylolisthesis at the

L5-S1 level with herniated nucleus pulposus, [and] incidental bilateral kidney cyst formation."

*Id.* at 9–10. Dr. Scilaris then generally concludes, without further analysis, that "there is a direct

causal relationship between the [2017 accident] and the injuries described above." *Id.* at 10.

### iii.    Cervical Spine

Based on Dr. Scilaris's consultation notes, Lee did not complain of neck pain in either of

his first two visits on February 5, 2018 and September 5, 2018. *Id.* at 9. Dr. Scilaris first

evaluated his alleged cervical spine injuries on June 4, 2019. *Id.* Defendants submitted evidence,

however, that Lee complained of neck pain to Dr. Gamburg of Hudson Pain Associates as early

as January 24, 2018, approximately one month after the accident. Hudson Pain Management

Reps., Defs.' Ex. MM ("Lee Gamburg Rep.") 11, ECF No. 32-41 (stating that Lee complained of

"[n]eck pain with radicular pain to bilateral arms/hands").

In his last consultation with Lee, Dr. Scilaris reviewed Lee's cervical spine MRI dated

February 16, 2018, which showed "herniated nucleus pulposus at C3–4, C4–5, C5–6, and C6–7."

Lee Scilaris Rep. 9. He diagnosed Lee with "[c]ervical herniated nucleus pulposus" and

generally asserted that "the injuries" in his report were caused by the 2017 accident. *Id.* at 10.

Although Dr. Scilaris tested Lee's cervical spine range of motion and determined that his lateral

bending was deficient, certain measurements are missing and he did not explain which method

he used to measure range of motion. *Id.* ("Physical examination of the cervical spine reveals

flexion 70 degrees (normal is 0 to 60 degrees), extension 0 [sic], lateral bending [sic] (normal is

0 to 45 degrees) and turning 30 degrees bilaterally (normal is 0 to 80 degrees)."). He identified a

"left trapezial spasm," but recorded a negative Spurling test and normal reflexes. *Id.*

Dr. Scilaris concludes generally that Lee's "injuries cannot be completely resolved by further medical intervention, and there will always be aspect[s] of residual permanent injuries experienced for the balance of Mr. Lee's lifetime." *Id.* at 11.

### C. Causation of Lee's Injuries

Defendants met their initial burden as to the cause of Lee's left knee and lumbar spine, but not with regard to Lee's cervical spine injuries. Dr. Gidumal concluded that his physical examination, which included a range of motion assessment and several objective tests, as well as his review of Lee's post-accident MRI and arthroscopic photographs, revealed no acute injury to Lee's left knee and showed evidence only of "old" injuries. For example, he explained that the arthroscopic photographs and MRI of Lee's left knee indicated that Lee's meniscal and ACL tears were degenerative, highlighting the degeneration of the condyles and the absence of traumatic chondral defects, kissing lesions, or hemarthrosis to substantiate his conclusion. *See supra* Discussion, Part II.A.i. *See Arenes*, 2006 WL 1517756, at *2, *6 (finding that defendants met prima facie burden where defendant medical expert reviewed post-accident MRI and, pointing to specific indicators on the films, concluded that they revealed only age-related degeneration). Although Dr. Gidumal acknowledged that Lee's 2018 MRI showed a partial ACL tear that was not present on the 2016 MRI, he explained that both the MRI and arthroscopic photographs indicated that the injury was degenerative. Not only did the ACL appear intact on the arthroscopic photographs, but he also detected no indicators of acute injury on the MRI, such as "hemarthrosis" or "kissing lesions on the lateral femoral condyle/lateral tibial plateau."

Similarly, relying on objective evidence, Dr. Gidumal identified only degenerative conditions in Lee's lumbar spine. *See supra* Discussion, Part II.A.ii. He explained Lee's disc herniations were degenerative because "[t]he changes had been going on for so long that there

were endplate changes within the vertebra," as evidenced by Lee's MRI. Lee also lacked

indicators of traumatic injury, such as "annular tears, bleeding, bone marrow edema or T2 signal

abnormality." Taken together, these explanations are sufficient to shift the burden to plaintiffs to

demonstrate that Lee's left knee and lumbar spine injuries were acute.

In contrast, however, Dr. Gidumal did not clearly conclude that Lee's cervical spine

injuries were degenerative or preexisting, and thus, defendants are unable to meet their initial

burden with regard to the cervical spine. *See* supra Discussion, Part II.A.iii above. Although Dr.

Gidumal explained that Lee's cervical spine MRI indicated that the injuries were degenerative,

he did not state a general conclusion, based on his evaluation of all of the evidence at his

disposal, that Lee's neck injuries were degenerative.

In the relevant portion of his opinion, Dr. Gidumal concluded that "there is no medical

evidence that Mr. Lee sustained any acute *back* injury." *Id.* at 5 (emphasis added). He made no

statement with regard to Lee's neck, and it is unclear that his reference to Lee's "back" applies to

both Lee's cervical spine and lumbar spine injuries. *Id.* Earlier in the same report, Dr. Gidumal

describes his physical examination of Lee's lumbar spine under the subheading "back," while

describing a similar examination of Lee's cervical spine using the subheading "neck." *Id.* at 3.

When describing Lee's medical history, he stated that "[t]he plaintiff . . . allegedly injured his

left knee, lower back and neck." *Id.* at 1. He also stated that "Mr. Lee is alleging a significant and

permanent injury to his *neck and lower back* as a result of the [2017 accident]." *Id.* at 4

(emphasis added). Generally, Dr. Gidumal's assessment that Lee's cervical spine injuries are

degenerative is persuasive—however, because it is unclear whether Dr. Gidumal referred to

Lee's cervical spine when stating his conclusion as to Lee's back, I cannot find that defendants'

have shifted the burden to plaintiffs with regard to Lee's cervical spine.

Although Dr. Scilaris broadly concluded that all of Lee's injuries were caused by the 2017 accident, Lee Scilaris Rep. 10, he "did not refute defendant[s'] evidence of a . . . degenerative condition." *Pommells*, 830 N.E.2d at 287 (granting summary judgment for defendants when, after defendant presented "persuasive evidence that plaintiff's alleged pain and injuries were related to a preexisting condition, plaintiff [did not] come forward with evidence addressing defendant's claimed lack of causation"); *see also Arenes* 2006 WL 1517756, at *8 ("When a defendant submits persuasive evidence that a plaintiff's alleged pain and injuries are related to a pre-existing condition, the plaintiff has the burden to come forward with evidence addressing the defendant's claimed lack of causation; if the plaintiff fails to meet that burden, the defendant is entitled to summary dismissal of the complaint.").

Dr. Scilaris's report was conclusory as to the cause of Lee's lumbar spine and left knee injuries, and thus, insufficient to refute defendants' initial showing. Dr. Scilaris presented evidence from Lee's MRIs and his own physical examinations that Lee's left knee and lumbar spine were injured. *See* Lee Scilaris Rep. 9–10. He did not, however, explain how this objective evidence indicated that Lee's injuries were caused by the 2017 accident, rather than degeneration. *Id.* "The law is clear that a conclusory expert opinion as to causation is insufficient to defeat a motion for summary judgment." *See Watson-Tobah*, 2014 WL 6865713, at *13 (citing *Carter*, 815 N.Y.S.2d at 43). A medical opinion does not refute defendants' initial showing of causation where it is "silent on the possibility of a degenerative condition" and "fails to consider the evidence of degeneration put forth by [defendants'] experts." *Rhone*, 2007 WL 3340836, at *9; *see also Arenes*, 2006 WL 1517756, at *9 (finding that plaintiffs did not carry burden where medical expert concluded that plaintiff's injuries were caused by the relevant accident, but "d[id] not explicitly address [defendant medical expert's] findings that plaintiffs'

50

injuries [we]re the result of a preexisting, degenerative condition" and "d[id] not explain what le[d] her to [her conclusion regarding causation]").

Likewise, a report by Dr. Gamburg, Lee's treating physician, which was submitted by defendants but also reviewed by Dr. Scilaris in the course of preparing his own report, also fails to raise a dispute of fact here. *See* Lee Gamburg Rep.[42] After conducting two physical examinations in January and February 2018 and reviewing Lee's MRIs, Dr. Gamburg concluded that the 2017 accident caused Lee's injuries. *Id.* at 9. In a prior report, he noted that Lee's past medical history was "[n]on-contributory" to injuries and stated, citing no evidence, that "[t]he patient was doing well with no limitations for activities such as [Activities of Daily Living (ADL)] and other vocational activities until the accident." *Id.* at 11. As with Dr. Scilaris's report, however, Dr. Gamburg's opinion appears to rely on Lee's statements regarding his condition prior to the accident and does not explain why the evidence he considers indicates that Lee's injuries were acute, rather than degenerative. Because plaintiffs did not present evidence refuting defendants' initial showing that Lee's injuries were degenerative, they failed to raise a genuine dispute of fact as to the cause of Lee's left knee and lumbar spine injuries. Accordingly, defendants are entitled to summary judgment as to Lee's left knee and lumbar spine claims.

**D.  Serious Injury as to Lee**

As I already discussed, Dr. Gidumal did not clearly indicate whether, considering the sum of the evidence at his disposal, Lee's cervical spine conditions were degenerative in nature. *See supra* Discussion, Part II.C. Having already found that triable fact disputes remain as to the cause of Lee's cervical spine injuries, I also find that defendants have not met their initial burden of showing that Lee suffered no significant limitation of use of his cervical spine.

---

[42] Dr. Gamburg's report was affirmed under penalty of perjury. *See* Lee Gamburg Rep. 9, 15.

Defendants' medical expert, Dr. Gidumal, acknowledged that Lee's post-accident MRI showed disc herniations on several cervical spine vertebrae. *See supra* Discussion, Part II.A.iii. Evidence of disc herniations alone are not sufficient to show significant injury. *Watson-Tobah*, 2014 WL 6865713, at *10 ("[B]ulging or herniated discs are not, in and of themselves, evidence of serious injury without competent objective evidence of the limitations and duration of the disc injury." (quoting *DeJesus v. Paulino*, 61 A.D.3d 605, 608 (N.Y. App. Div. 2009))); *Tsveitel*, 2009 WL 2182379, at *5 (same) (citing *Guzman v. Paul Michael Mgmt.*, 266 A.D.2d 508, 509 (N.Y. App. Div. 1999)). However, nearly two years after the accident, Dr. Gidumal also determined that Lee's cervical spine range of motion was restricted compared to normal functioning—Lee's right and left lateral rotation was 25% below normal and his right and left lateral bending was 33% below normal. *See supra* n.31. Because his range of motion test entailed objectively measuring Lee's subjective efforts, its results carry less weight than a passive test would. *See Ventra*, 121 F. Supp. 2d at 334. It is corroborated, however, by Dr. Gamburg's post-accident range of motion testing, which was both active and passive and measured using a goniometer or arthrodial protractor. Lee Gamburg Rep. 7. In February 2018, Dr. Gamburg determined that Lee's range of motion was significantly restricted, each motion revealing between a 22% and 44% restriction below normal. *Id.*

Considering Lee's subjective complaints of pain, Lee Aff. ¶¶ 3–4, 15–16, the presence of cervical spine disc herniations, and restricted range of motion persisting for approximately two years, defendants have not made an initial showing that Lee suffered no significant limitation to his cervical spine. Thus, the burden of raising a genuine fact issue does not shift to plaintiffs. It is for the jury to determine the extent of Lee's cervical spine injuries, as well as whether they were caused by the 2017 accident or age-related degeneration. Because I find that genuine disputes of

fact remain as to whether Lee suffered a significant limitation of the use of his cervical spine as a result of the 2017 accident, I need not evaluate defendants' claim that he failed to meet the permanent consequential limitation or 90/180 standard.

## III.   Plaintiff Kwon

Kwon alleges that she sustained injuries to her right shoulder, right ankle, cervical spine, lumbar spine, and thoracic spine from the 2017 accident. *See supra* Factual Background, Part III.A. She affirms that she had no injuries or pain to any of these body parts prior to the 2017 accident. Kwon Aff. ¶¶ 13–14. Defendants maintain that Kwon's injuries are degenerative, and thus, not proximately caused by the 2017 accident. Defs.' Br. 28–30. I find that defendants are entitled to summary judgment as to Kwon's right shoulder and right ankle injuries because plaintiffs demonstrated no genuine dispute of fact that they were proximately caused by the 2017 accident. I also grant summary judgment as to Kwon's cervical spine and lumbar spine injuries because defendants demonstrated that they were not "serious injuries" under the No-Fault Law. Defendants' motion is denied with regard to Kwon's alleged thoracic spine injuries.

### A.  Summary of Defendants' Evidence

Defendants' medical expert, Dr. Gidumal, examined Kwon on October 7, 2019 and reviewed a selection of her treatment records and diagnostic studies, including records of post-accident medical treatment from January to March 2018, records of her right shoulder arthroscopy dated March 16, 2018, and various MRIs from January through March 2018. Kwon Gidumal Rep. 1–3.

#### i.   Right Shoulder

Dr. Gidumal concluded that Kwon's right shoulder MRI, intraoperative findings, medical records, and his own physical evaluation revealed "no evidence that [she] sustained a significant

or permanent injury to her right shoulder as a result of the [2017 accident]." *Id.* at 6. Based on his physical examination of Kwon's right shoulder, Dr. Gidumal reported that she had a normal range of motion,[43] no swelling, atrophy, signs of impingement, subdeltoid or scapulothoracic crepitus, pain at her A-C joint, tenderness, or deformity. *Id.* at 4.  Kwon's belly press and liftoff tests were negative. *Id.*[44]

Additionally, he maintained that his review of Kwon's right shoulder MRI revealed "no evidence of any acute injury," as there was "no swelling, bone marrow edema, soft tissue contusion or marrow edema." *Id.* at 6. Rather, "[t]he MRI showed evidence of long-standing abnormalities in the shoulder with a grossly enlarged and thickened biceps tendon. There was hypoplasia of the anterior and posterior labrum consistent with partial tears. The glenohumeral and acromioclavicular joint showed degenerative arthritis with impingement upon the rotator cuff." *Id.* The MRI findings were "consistent with long-standing degenerative changes with degenerative arthritis and thickening of the tendons with no evidence of acute injuries." *Id.*

His opinion that Kwon's injuries were degenerative was bolstered by his review of Kwon's right shoulder arthroscopy records and intraoperative photographs, which revealed no evidence of a traumatic tear. *Id.* He explained that "[t]he intraoperative [arthroscopic] evaluation showed evidence of an impingement syndrome . . . . An impingement syndrome is in age-related,

---

[43] As previously discussed, *see supra* Discussion, Part I.A.ii n. 23, Dr. Gidumal determined plaintiffs' range of motion by measuring their voluntary movements with a goniometer. Kwon Gidumal Rep. 4.

[44] Citing no authority, plaintiffs maintain that Dr. Gidumal's report should be rejected as "arbitrary and cursory" because he failed to "conduct necessary objective test[s], such as O'Brien's test, to assess [Kwon's] labral tear injuries to the right shoulder." Pls.' Br. 22. I disagree, as Dr. Gidumal's opinion relies on several forms of objective evidence, including an MRI and arthroscopic photographs.

degenerative or congenital condition. It is not a traumatic condition." *Id.* Furthermore, the arthroscopic photographs demonstrated that the superior and anterior labrum were "fray[ed]," and thus, did not show a traumatic tear. *Id.*

ii.     **Right Ankle**

Dr. Gidumal also concluded that "based on the medical records, the MRI findings[, and] my examination there is no evidence that Ms. Kwon sustained a significant or permanent injury to her right ankle as a result of the [2017 accident]." *Id.* at 6.[45] In his opinion, Kwon's right ankle MRI demonstrated only "age-related degeneration with some joint space narrowing (degenerative arthritis) and tendinosis (age-related degeneration of the tendon) and no evidence of any acute injuries." *Id.* at 5. He noted that "[t]here was no evidence of any ligament tears or even a minor ankle sprain" which might indicate acute injury. *Id.*

Dr. Gidumal's conclusion was supported by his physical examination of Kwon, during which he observed her walking with no limp or aid, no swelling, ecchymosis, pain in the tibia or fibula, pain in the peroneal tendon, or atrophy. *Id.* at 3. Her anterior drawer test was negative and her range of motion normal. *Id.* Dr. Gidumal noted point tenderness only along the anterior capsule. *Id.*

iii.    **Cervical Spine**

Although Dr. Gidumal concluded that there was "no object[ive] evidence of any significant or permanent injury to [Kwon's] neck," he acknowledged that Kwon's cervical spine

---

[45] Plaintiffs argue that Dr. Gidumal "failed to opine regarding the causation/permanency of Plaintiff Kwon's right ankle injuries[.]" Pls.' Br. 25. To the contrary, as summarized here, Dr. Gidumal clearly outlined his findings as to the cause and severity of Kwon's alleged ankle injury, presenting persuasive evidence that the ankle injuries were degenerative, rather than acute.

MRI showed "loss of the disc height at C3-C4 with a 5 mm central and left paracentral disc herniation with central and left lateral recess spinal stenosis." *Id.* at 5. He did not explain why he concluded that the C3-C4 disc herniation was a degenerative, rather than acute, injury.

Dr. Gidumal stated that the plaintiff's EMG/NCV tests[46] revealed "minor abnormalities" on a different vertebra, the left C5-C6 region of the cervical spine. In contrast to the EMG/NCV results, however, the MRI presented "minor abnormalities" on the opposite side—the right C5-C6 region. *Id.* at 3, 5. Based on this discrepancy, Dr. Gidumal concluded that the abnormalities were "within normal limits and show no object[ive] evidence of an acute or significant injury to the neck or lower back." *Id.* at 5. During his physical examination, he noted that Kwon had a normal range of motion with subjective complaints of pain and "mild tenderness over the midline and over the bilateral paraspinal muscles." *Id.* at 4.

### iv.    Lumbar Spine

Similarly, Dr. Gidumal noted multilevel disc bulging on Kwon's lumbar spine MRI, but opined that there was "no object[ive] evidence of any significant or permanent injury to [Kwon's] . . . lower back." *Id.* at 5. In his physical examination, he observed that she had normal lumbar lordosis, level iliac crests and no pelvic rotation, scoliosis, or leg length deficiency. *Id.* at 3. Kwon's range of motion was normal,[47] although she complained of pain. *Id.* Dr. Gidumal documented no Valsalva signs and negative Kemp and Patrick test results. *Id.* An EMG/NCV of Kwon's lower back and lower extremities indicated that Kwon's responses were normal and Dr.

---

[46] No EMG/NCV tests were included in the record.

[47] Dr. Gidumal's report summarized an evaluation by Dr. Tak conducted on January 5, 2018, within a month of the 2017 accident. Dr. Tak allegedly reported that Kwon's lumbar spine demonstrated a limited range of motion. Kwon Gidumal Rep. 1. As the original report was not included in the record and this summary states neither the measurement method nor the extent of the limitation, I disregard this finding.

Gidumal observed no evidence of myelopathy, radiculopathy or nerve root irritation. *Id.* at 2–3, 5. Despite these findings, Dr. Gidumal did not explain why the disc bulging that he identified on her MRI was degenerative, rather than acute.

### v.   Thoracic Spine

Although Dr. Gidumal reportedly examined Kwon's thoracic spine MRI, which showed multilevel disc bulging, *see id.* at 3, he makes no explicit finding as to the cause or severity of Kwon's alleged thoracic spine injuries, *see id.* at 4–6 (finding no causation as to Kwon's neck and lower back injuries, but not mentioning Kwon's alleged thoracic spine injuries).

### B.  Plaintiffs' Response

On June 18, 2019, Dr. Scilaris prepared a report following two physical examinations on February 5, 2018 and June 4, 2019, as well as a review of Kwon's right shoulder, right ankle, and cervical, lumbar, and thoracic spine MRIs. Kwon Scilaris Rep. 8–9. As with Lee, Dr. Scilaris stated a blanket finding of causation as to all of Kwon's injuries, concluding that "with a reasonable [degree] of medical probability, there is a direct causal relationship between the [2017 accident] and the injuries described above." *Id.* at 11. At no point, however, does he address Dr. Gidumal's findings that Kwon's right shoulder and right ankle injuries were degenerative.

### i.   Right Shoulder

As to Kwon's right shoulder injuries, Dr. Scilaris notes that she complained of right shoulder pain during her February 5, 2018 consultation. *Id.* at 9. A physical examination revealed "mild-to-moderate impingement, forward flexion and abduction of 160 and 140 degrees with pain and apprehension and bicipital groove tenderness." *Id.* He reported that Kwon experienced limited range of motion in her shoulder, without describing how his range of motion test was conducted. *Id.* at 9–10. Although Dr. Scilaris reviewed and summarized Kwon's right shoulder

MRI and arthroscopy records, he did not explain why this evidence indicated that her injuries resulted from acute trauma, rather than degeneration. *Id.*

Dr. Scilaris diagnosed Kwon with "[s]tatus post right shoulder arthroscopy performed by Dr. Wert with *possible* recurrent rotator cuff or labral tear." *Id.* at 10 (emphasis added). At no point did he address the issue of causation raised by defendants, besides stating generally that Kwon's injuries were caused by the 2017 accident.

### ii.   Right Ankle

In a similar vein, Dr. Scilaris noted that on February 4, 2018, Kwon complained of pain in her right ankle and he observed "swelling along the lateral gutter," neutral dorsiflexion, and "plantar flexion [of] 40 degrees with painful inversion at 15 and 20 degrees." *Id.* at 9. In addition to documenting tenderness in Kwon's anterolateral ankle and anterior syndesmosis, Dr. Scilaris avers that Kwon's range of motion was more restricted during her June 2019 consultation, with a dorsiflexion of 15 degrees and plantar flexion of 35 degrees, both slightly below normal. *Id.* at 10. Again, Dr. Scilaris did not explain what method he used to measure Kwon's range of motion. He noted, without analysis, that Kwon's right ankle MRI revealed Achilles tendinosis/tendonitis. *Id.* at 9. To conclude, Dr. Scilaris diagnosed Kwon with right ankle tenosynovitis, without explaining why he determined that the condition was caused by trauma rather than long-term degeneration. *Id.* at 10.

### iii.   Cervical, Lumbar, and Thoracic Spine

Dr. Scilaris's findings as to Kwon's alleged spinal injuries are scant, at best. Although he met with Kwon in February 5, 2018, his records show that she did not complain of any spinal injury during the consultation. *Id.* at 9. Over a year later, on June 4, 2019, he reported that Kwon complained of intermittent back and neck pain. *Id.* at 10. His findings as to her range of motion

are incomplete, and therefore, of no probative value. He reports that "[p]hysical examination of the cervical spine reveals flexion 80 degrees (normal is 0 to 60 degrees), extension 0, mild pain with lateral bending and turning." *Id.* Likewise, he states that "[p]hysical examination of the thoracolumbar spine[48] reveals flexion to 80 degrees (normal is 0 to 60 degrees), extension 0." *Id.* In neither case did he indicate how he measured Kwon's range of motion, compare each measurement to a normal range, or include all of the relevant measurements for the body part. He reported that Kwon's Spurling test was negative and her straight leg test equivocal. *Id.* at 10.

Consistent with Dr. Gidumal, Dr. Scilaris noted that Kwon's 2018 cervical spine MRI showed "herniated nucleus pulposus at C3-C4." *Id.* at 9. MRIs of Kwon's lumbar and thoracic spine each showed "multilevel disc bulging." *Id.* On the basis of this evidence, he diagnosed Kwon with "[c]ervical thoracolumbar derangement" and opined that "her injuries cannot be completely resolved by further medical intervention, and there will always be aspect[s] of residual permanent injuries experienced for the balance of Ms. Kwon's lifetime." *Id.* at 10–11.

### iv.    Kwon's Affidavit

Kwon submitted an affidavit averring that she never experienced pain in any of the relevant body parts prior to the accident, but since the accident, suffers daily pain in each. Kwon Aff. ¶¶ 14–18. She also claims that her "daily life has been significantly altered." *Id.* ¶ 19. Specifically, she notes that

> [she] can no longer [play] tennis. Moreover, [she has] difficulty performing various activit[ies] such as lifting heavy items, standing [for] an extended period of time, sitting for an extended period of time, walking for a prolonged period of time and doing household chores such as cleaning and doing dishes and laundry.

*Id.* She also maintains that she was treated for her injuries three times per week at Baarn Rehab and Pain Clinic from January 10, 2018 to March 15, 2018 and again from December 18, 2018 to

---

[48] The thoracolumbar spine encompasses both the lumbar and thoracic spinal regions.

March 11, 2019.[49] *Id.* ¶ 4. She stopped her treatment because further treatment would be palliative. *Id*.

### C.  Causation

By submitting persuasive evidence that Kwon's right ankle and shoulder injuries are the result of degeneration rather than acute trauma from the 2017 accident, defendants have met their initial burden with regard to those injuries, shifting the burden of proof to plaintiffs to raise a genuine dispute of fact as to their cause. Defendants did not make the same showing, however, with regard to Kwon's cervical spine, lumbar spine, or thoracic spine injuries, so the burden does not shift with regard to those injuries.

For both Kwon's right shoulder and right ankle injuries, Dr. Gidumal concluded that the objective evidence demonstrated only degenerative changes, rather than acute injury. *See supra* Discussion, Part III.A.i–ii. For both regions, he highlighted indications on Kwon's MRIs that signaled that her injuries were acute—for example, the absence of "swelling, bone marrow edema, soft tissue contusion or marrow edema" on her shoulder or "any ligament tears or even a minor ankle sprain" on her ankle. Additionally, he identified signs of degenerative arthritis in both regions. His assessment of Kwon's right shoulder MRI was corroborated by her intraoperative photographs, on which he observed evidence of impingement syndrome, a degenerative condition, and fraying of her labrum. With regard to both regions, therefore, defendants shift the burden to plaintiffs to show causation.

By contrast, Dr. Gidumal concluded that Kwon's cervical spine was not injured in the 2017 accident, but did not explain how he determined that the C3-C4 disc herniation identified on her

---

[49] Neither defendants nor plaintiffs submitted records of the treatment Kwon allegedly received here.

2018 MRI was unrelated to the accident. *See supra* Discussion, Part III.A.iii. In a similar vein, Dr. Gidumal identified multilevel disc bulging on Kwon's lumbar spine MRI, but did not explain why such an injury was degenerative. *See supra* Discussion, Part III.A.iv. Lastly, Dr. Gidumal did not opine as to the cause of Kwon's thoracic spine injury at all. *See supra* Discussion, Part III.A.v . Summarizing Kwon's thoracic spine MRI finding of multilevel disc bulging, without more, cannot carry defendants' burden. Thus, at summary judgment, Dr. Gidumal's opinion and defendants' supporting evidence is insufficient to show an intervening cause of Kwon's cervical, lumbar, or thoracic spine injuries. The burden does not shift to plaintiffs with regard to the cause of Kwon's spinal injuries.

Plaintiffs did not demonstrate a genuine dispute of fact as to the cause of Kwon's right shoulder or ankle injuries. Dr. Scilaris's medical opinion offers a blanket statement that all of Kwon's injuries were caused by the 2017 accident. *See supra* Discussion, Part III.B.i–ii above. He fails to explain, however, how his physical examination or review of her MRIs and other medical records showed that her injuries were acute, rather than degenerative and preexisting. For example, Dr. Scilaris diagnosed Kwon as "[s]tatus post right shoulder arthroscopy performed by Dr. Wert with *possible* recurrent rotator cuff or labral tear." Besides presenting an equivocal statement as to her rotator cuff and labral tears, he did nothing to rebut Dr. Gidumal's determination that Kwon's degenerative arthritis, impingement, and frayed labral tear indicated that these conditions were degenerative. He advanced the same inadequate argument for Kwon's right ankle injuries, stating that Kwon's MRI indicated that she suffered from Achilles tendinosis/tendonitis, but avoiding any explanation relating that finding to the 2017 accident. Thus, defendants are entitled to summary judgment as to Kwon's right shoulder and ankle injuries.

### D.  Serious Injury

Although defendants did not meet their initial burden as to the cause of Kwon's spinal injuries, they have made an initial showing that Kwon's cervical spine and lumbar spine injuries are neither a "permanent consequential limitation of use of a body organ or member [nor a] significant limitation of use of a body function or system," shifting the burden to plaintiffs. Plaintiffs have not adduced sufficient evidence to raise a genuine dispute of fact.

Defendants' expert, Dr. Gidumal, concluded that Kwon did not suffer from a significant or permanent injury to her neck or lower back. His physical examination yielded no signs of injury beyond Kwon's subjective complaints of pain and a normal range of motion test for both spinal regions. Although he identified multilevel disc bulging of the lumbar spine and a herniated disc at the C3-C4 cervical spine vertebrae on Kwon's 2018 MRIs, evidence of disc bulging or a herniated disc without proof of a corresponding limitation is insufficient to show "serious injury." *Young Sung Lee*, 718 F. App'x at 15; *Watson-Tobah*, 2014 WL 6865713, at *10. Dr. Gidumal's report, therefore, is sufficient to shift the burden to plaintiffs.

Plaintiffs, in turn, failed to meet their corresponding burden with regard to Kwon's cervical and lumbar spine injuries. Kwon's medical expert, Dr. Scilaris, did not show that Kwon suffered any limitation as a result of her lumbar or cervical spine injuries. *See supra* Discussion, Part III.B.iii. Based on his June 4, 2019 physical examination, his record of Kwon's cervical and lumbar spine ranges of motion were incomplete. Other tests conducted during examination indicated that Kwon experienced no limitations and suffered no injury to the relevant body parts—for example, Kwon's Spurling test was negative and her straight leg test equivocal. Kwon's spinal injuries were not referenced at all during her earlier consultation with Dr. Scilaris in February 2018. Like Dr. Gidumal, Dr. Scilaris identified signs of multilevel disc bulging of the lumbar spine and herniated nucleus pulposus at the cervical spine's C3-C4 vertebrae on Kwon's MRIs, but without evidence

showing a physical limitation stemming from the condition, evidence of these conditions alone is insufficient to meet plaintiffs' burden. *See Evans*, 978 F. Supp. 2d at 165 (quoting *Katiraeifar*, 1999 WL 425907, at *1).

Similarly, plaintiffs did not raise a genuine dispute of fact that Kwon's lumbar and cervical spinal injuries "prevented [her] 'from performing [her] usual activities to a great extent, rather than some slight curtailment' for ninety of the 180 days following the accident." *Id.* at 166 (quoting *Licari*, 441 N.E.2d at 1091). A plaintiff must support her 90/180 standard claim with "objective evidence of 'a medically determined injury or impairment of a non-permanent nature.'" *Toure*, 774 N.E.2d at 1204. "[T]he ninety days requirement must be taken literally." *Arenes*, 2006 WL 1517756, at *9 (citing *Licari*, 441 N.E.2d at 1091).

"[C]ourts have generally found a defendant's initial burden [for a 90/180 standard claim] met where the plaintiff worked for more than ninety of the one hundred and eighty days following an accident or returned to work soon after the accident." *Perpall*, 2017 WL 1155764, at *26 (collecting cases); *Tsveitel*, 2009 WL 2182379, at *4 (determining that "plaintiffs [could not] plausibly claim that their daily activities were curtailed for ninety of the first one hundred eighty days following the . . . accident" because the record showed that each plaintiff was confined to his/her home for seven days or fewer and returned to work in the same amount of time); *Fludd v. Pena*, 997 N.Y.S.2d 14, 16 (N.Y. App. Div. 2014) (granting defendants' summary judgment motion where plaintiff's deposition testimony established that she returned to work on limited duty as a police officer eight weeks after her injury); *Marks v. Brown*, 3 A.D.3d 648, 650–651 (N.Y. App. Div. 2004) (dismissing plaintiff's 90/180 standard claim where she missed one day of work, was restricted in her ability to sit, stand, and lift when she returned to work, had difficulty sleeping, and performed household chores more slowly following an accident). Although a partial restriction

from performing work duties may, in some circumstances, be sufficient to substantiate a 90/180 standard claim, plaintiffs made no such showing here. *See Perpall*, 2017 WL 1155764, at *26 ("The fact that a plaintiff returns to work during the relevant period does not necessarily defeat a claim of serious injury." (quoting *Sanchez*, 658 F. Supp. 2d at 509–10) (denying summary judgment for defendants when plaintiff returned to work after eleven days with restrictions on her ability to sit, bend, and lift, and was unable to perform household chores)); *see also Nigro v. Penree*, 661 N.Y.S.2d 137, 138 (N.Y. App. Div. 1997) (denying summary judgment for defendants because, although plaintiff returned to work two weeks after accident, he was "unable to perform the activities of his profession" for more than ninety days).

Both parties agree that Kwon's injuries did not totally prevent her from working as a restaurant owner and operator. Defs.' 56.1 ¶ 49; Pls.' 56.1 ¶ 49. Plaintiffs admit that Kwon returned to work with no limitations after approximately seventy days, stating in their response to defendants' interrogatories that Kwon "was not partially incapacitated from employment from March of 2018 to December of 2018." Ans. to Interrogs. ¶ 11. Because the accident took place on December 21, 2017, Kwon would have needed to experience a substantial partial restriction to her employment duties for ninety days in the period before June 19, 2018. The first ninety-day period concluded on March 21, 2018. Thus, by Kwon's admission that she returned to work and experienced no restrictions as of March 2018, she was not incapacitated from her work duties for the requisite amount of time. *See Perpall*, 2017 WL 1155764, at *26 (finding that defendants met initial burden by relying on plaintiff's deposition testimony to show that "she only missed about two months of work after the 2010 accident").

Furthermore, in the instant case, it is undisputed that Kwon was confined to her residence for only five days following the accident and an additional three days after her arthroscopy in

March 2018, both within the 180-day window allowed by the No-Fault Law. Defs.' 56.1 ¶ 48; Pls.'
56.1 ¶ 48. Kwon maintains that, as a result of the accident, she has difficulty performing household
chores, lifting, and sitting, standing, walking for prolonged periods of time. Kwon Aff. ¶ 19. Kwon
also avers that she can no longer play tennis, but fails to establish the frequency with which she
played tennis before the accident. *Id.* In *Brusso v. Imbeault*, the district court granted summary
judgment for defendants where plaintiff had "offered only her own deposition testimony
describing that she no longer engages in certain household chores, such as vacuuming and laundry,
and no longer enjoys bicycling or camping without pain," noting that "[n]o evidence exist[ed] in
the record establishing the frequency with which she engaged in those activities prior to the
accident or that those activities became more difficult during 90 of the first 180 days following the
accident." 699 F.Supp.2d at 583; *see also Mercado*, 2008 WL 4963985, at *6 (finding that
plaintiff's affirmation that he could not play sports, was limited in his activities with teenage son,
and could not lift young son were insufficient because he did not "provide[] evidence showing that
sports and interacting with his sons were a substantial part of his daily activities" (citing *Covey v.
Simonton*, 481 F. Supp. 2d 224, 240 (E.D.N.Y.2007) and *Cooper v. Dunn*, No. 99-Civ-6903(ILG),
2001 WL 138864, at *11 (E.D.N.Y. Jan. 2, 2001))).

Although Kwon's medical expert, Dr. Scilaris, examined her during the first ninety-day
period on February 5, 2018, he did not mention her spinal injuries at all. Kwon Scilaris Rep. 9
(referencing only Kwon's right ankle and shoulder complaints). His notes from that visit do not
indicate that he curtailed Kwon's activities at work or in her daily life in any way.[50] *Id.*; *see Singh*

---

[50] Dr. Gidumal's medical report summarizes two consultations between Kwon and Dr. Tak on
January 5, 2018 and February 26, 2018. Kwon Gidumal Rep. 1–2. Neither plaintiffs nor
defendants introduced Dr. Tak's notes themselves into the record. Dr. Tak documented Kwon's
subjective complaints of pain in her neck and back in January and her complaints that the pain
intensifies when sitting, standing, walking, and getting out of bed in February. *Id.* This summary

*v. Maresco*, No. 04-CV-1439 (JG)(CLP), 2008 WL 324360, at *8 (E.D.N.Y. Feb. 6, 2008) ("Even if [plaintiff] had presented evidence sufficient to support a jury finding that he refrained from his usual and customary activities for the necessary time period, his claim would fail because he must also provide competent medical testimony that he was unable to engage in his usual and customary activities because of injuries sustained (or exacerbated by) the accident at issue."). Thus, plaintiffs have not met their burden of showing that Kwon's cervical or lumbar spine injuries were "serious" under the 90/180 standard and defendants are entitled to summary judgment as to those injuries.

Finally, defendants made no initial showing as to Kwon's thoracic spine injuries. Dr. Gidumal merely summarized the findings from Kwon's thoracic MRI, but stated no conclusion as to the alleged injury's cause, severity, or duration. The burden does not shift to plaintiffs to prove significant or permanent limitation of Kwon's thoracic spine, and thus, this claim survives summary judgment. Given the paucity of evidence pertaining to Kwon's thoracic spine in general, however, it is extremely unlikely that plaintiffs will prevail on this claim.

## CONCLUSION

Defendants' motion for summary judgment is granted in part and denied in part. Defendants demonstrated that the following injuries were not proximately caused by the 2017 accident: Kang's left shoulder, right knee, lumbar spine and cervical spine injuries; Lee's left knee and lumbar spine injuries; and Kwon's right shoulder and right ankle injuries. Defendants also demonstrated that Kwon's lumbar spine and cervical spine injuries are not "serious" pursuant to the No-Fault Law. Accordingly, defendants are entitled to summary judgment on each of those injuries. Genuine disputes of material fact as to whether Kang's head injury, Lee's cervical spine

---

does not indicate, however, that Dr. Tak placed a medical restriction on Kwon's activities as a result of her spinal conditions.

injury, and Kwon's thoracic spine injury qualify as "serious injuries" pursuant to the No-Fault Law

or were caused by the 2017 accident preclude summary judgment at this time.

SO ORDERED.

_____/s/_____
Allyne R. Ross
United States District Judge

Dated:          August 14, 2020
                Brooklyn, New York